[Civ. No. 39356. First Dist., Div. Four. Mar. 15, 1979.]

NEAL ROYER, Plaintiff and Respondent, v.
RALPH J. STEINBERG et al., Defendants and Appellants.

**COUNSEL**

Keogh, Marer & Flicker, Gerald Z. Marer, Michael R. Flicker and Alan G. Marer for Defendants and Appellants.

Morrison & Foerster, William H. Alsup, James P. Bennett, Amitai Schwartz, Alan L. Schlosser, Margaret C. Crosby, Biddle, Walters & Bukey, W. Craig Biddle, Robert G. Walters and John L. Bukey as Amici Curiae on behalf of Defendants and Appellants.

Campbell, Warburton, Britton, Fitzsimmons & Smith, C. Michael Smith, William T. Brooks, Charles R. Reed and Eleanor M. Kraft for Plaintiff and Respondent.

## OPINION

**DRUMMOND, J.**\*—Defendants-appellants Ralph J. Steinberg, Richard MacQuiddy and Eleanor Graham-Armstrong (appellants) appeal from a judgment against them and in favor of plaintiff-respondent Neal Royer (Royer) in the amount of $200,000 jointly in compensatory damages and $2,000, $2,000 and $300 respectively in punitive damages. The judgment is the result of an action for libel and conspiracy to libel stemming from statements made by appellants in a motion passed by them as members of the board of trustees of a school district.

### STATEMENT OF FACTS

At all times pertinent to the instant controversy, appellants were the elected trustees of the Campbell Union School District, serving without compensation. Royer began teaching in the school district in 1948, became a principal in 1952, and was appointed superintendent in 1965.

Shortly prior to the April 15, 1969, trustee election in which appellants Steinberg and Graham-Armstrong were running, certain flyers circulated throughout the district purporting to originate from the Campbell Elementary Teachers Association (CETA). The flyers made false and derogatory statements ostensibly in support of the election and reelection of appellants Steinberg and Graham-Armstrong. In fact, CETA had nothing to do with the flyers. Two more fake flyers were sent during the special school board election campaign of February 1970 in which appellant MacQuiddy was a candidate. One flyer purported to originate from CETA; the other falsely purported to be from Gordon Martin, president of the West Valley Federation of Teachers. Both again supposedly supported MacQuiddy's candidacy, but contained statements making MacQuiddy and Steinberg look ridiculous.

At the request of Gordon Martin, the board appointed a citizens group to ascertain the source of the fake flyers.

Shortly thereafter, Martin and Robert Persky, president of CETA, met with Inspector Bobby Martin[1] of the U.S. Postal Department and gave him copies of the flyers and several envelopes in which they had been

---

\*Assigned by the Chairperson of the Judicial Council.

[1]Inspector Martin and Gordon Martin are not related. For convenience, Inspector Bobby Martin will hereafter be referred to as "Inspector Martin."

mailed. In response to an inquiry by Inspector Martin, they told him they suspected Royer of being the typist because of his active opposition to appellants' candidacies in the 1969 and 1970 campaigns. Inspector Martin asked for samples of Royer's typing, which were furnished to him.

Gordon Martin testified that Inspector Martin told him on at least two subsequent occasions that the lab reports had confirmed that all three flyers were typed by the same person, and that the typing on the flyers and the typing on Royer's exemplars were the same. The inspector had also said that there was "no question in his mind but that Mr. Royer had typed the publications." Steinberg, who was appointed board liason to the citizens' inquiry group, testified that Inspector Martin made identical statements to him. Both Martin and Steinberg also testified that Inspector Martin told them he had advised Royer of his constitutional rights and confronted him with the evidence; that Royer had almost "broken down" and confessed, but in the end meekly denied it.

The deposition testimony of Inspector Martin, which was introduced into evidence, was that he could not recall telling either Steinberg or Martin that in his opinion Royer was the typist. Inspector Martin did concede that he told the men that there were "similarities" between Royer's exemplars and the flyers and that it was "possible" that Royer was the typist. He also admitted confronting Royer and accusing him of being the typist. He said that Martin later called and asked him about the confrontation and that he simply told him that Royer denied it.

On October 1, 1970, the school board met in executive session to meet with Postal Inspector Meier, who had been assigned to the investigation in the aftermath of Inspector Martin's promotion and transfer to another department. At the meeting, Meier allowed the postal investigation file to be passed among the board members. All three appellant board members testified that they saw a memo in the file stating that it was the author's opinion that Royer had typed and distributed the flyers. Board members Ruscigno and Gilliland, however, could not recall seeing any such document in the file.

By this time the relationship between appellant board members and Royer, which had already deteriorated over other matters, reached crisis proportions. An executive session was held on October 5, 1970, during which Royer offered to resign if it would help the district. A due process hearing, at which the board would receive evidence and rule upon the

charges against Royer, was favored by appellants, but board members Ruscigno and Gilliland were opposed.

On October 8, 1970, the board held a public meeting and voted three-to-two to demote Royer from his position as superintendent and reassign him as principal. Appellants voted in favor of the motion, while Ruscigno and Gilliland voted against it. Pursuant to the instructions of county counsel, the reasons for Royer's demotion were kept confidential.

On November 17, 1970, Royer wrote a letter to the board requesting a statement of reasons for his demotion. An executive session attended by Royer and his attorney was held on November 30, during which MacQuiddy, the president of the board, began to orally state the reasons for the action, but was admonished by county counsel to remain silent. Royer's counsel then told the board that he wanted the reasons for Royer's demotion in writing.

After several drafts prepared by county counsel, the board sent a confidential letter to Royer stating the reasons for his demotion dated January 19, 1971. The letter enumerated several grounds for the board's action, including participation in preparing and distributing the fake election flyers, improper public criticism of the business manager, failure to carry out responsibilities in the supervision and management of district funds and disharmonious relations with the district board, staff and employee organizations.

On March 8, 1971, Royer wrote "[a]n open letter to the taxpayers and employees of the Campbell Union School District." The letter *reproduced the board's confidential January 19, 1971, letter in its entirety* and contained Royer's point-by-point response to each of the charges enumerated therein. Royer "challenged" the board's president "to prove" the charge of improper election activities. Royer personally delivered this letter to the Campbell Press, a local newspaper, where it was published on March 10, 1971. The letter was soon thereafter published in the San Jose Mercury, the San Jose News and the Saratoga Press.

On March 11, 1971, the board passed a motion stating that it welcomed the fact that Royer had released to the public the January 19 letter, "thereby relieving the Board from the obligation to remain silent on the subject." It went on to state that a detailed reply to Royer's open letter would be forthcoming at the earliest opportunity. There was no objection made by Royer to the proposed "detailed reply."

The board issued its promised reply to Royer by motion, passed in a public meeting on March 25, 1971. The motion was adopted by a three-to-two vote, appellants voting in favor and Ruscigno and Gilliland voting against. The motion contained the following language, which is the subject of the instant lawsuit: "IT IS A FACT established with reasonable certainty by evidence and information contained in the Postal Inspector's file and which was made known by the Postal Inspector in the course of his investigation, that Royer typed and distributed the anonymous letters purporting to represent the views of the A.B.C. unit of C.E.T.A. and Gordon Martin of W.V.F.T. in connection with the Board elections of April 15, 1969 and February 17, 1970. [¶] IT IS A FACT that these letters contained misrepresentations of fact. Their apparent purpose was to cause public confusion and to influence the outcome of the elections by making it appear that C.E.T.A. and Gordon Martin of W.V.F.T. and various citizens in our community were promoting a number of ridiculous and outrageous demands, and that certain candidates would work towards their fulfillment. In doing so, the sender of the letters was holding up to ridicule these candidates, C.E.T.A., Gordon Martin of W.V.F.T. and various citizens in our community." The motion concluded by stating that the fact that distribution of the fake flyer-letters failed to constitute illegal activity did not make the activity permissible: "The Board majority does not subscribe to the theory that any conduct by a superintendent is permissible so long as it does not violate the law. . . . If he [Royer] chooses . . . to engage in activity such as the production and distribution of anonymous and scurrilous letters purporting to represent teaching organizations and representatives to influence elections, he not only materially breaches his contract, but he demeans and degrades the office of District Superintendent. The Board majority does not condone such behavior."

Royer sued appellants for libel, interference with contract and conspiracy to do each of the above. The libel asserted was the board's motion of March 25, 1971 (hereafter the March 25 motion), appearing in the March 26, 1971, edition of the Daily Bulletin, the official school district newspaper. Appellants' motion for judgment on the pleadings was granted as to Royer's interference with contract actions. The jury rendered a nine-to-three verdict in favor of Royer and against appellants in the amount of $200,000 in compensatory damages. Appellants Steinberg and MacQuiddy were additionally found liable for $2,000 in punitive damages, while appellant Graham-Armstrong was found liable for $300 in punitive damages. Appellants filed motions for new trial and for judgment notwithstanding the verdict, both of which were denied.

This appeal ensues.

■ Were appellants' statements absolutely
privileged under the doctrine of consent?

One of the oldest and most widely recognized defenses to the publication of defamatory matter is the doctrine of consent, which has been classified as a form of *absolute privilege*. (Rest.2d Torts, § 583; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 300, p. 2572.) As explained in the early Supreme Court case of *Pouchan* v. *Godeau* (1914) 167 Cal. 692, 694 [140 P. 952]: " 'Where a defendant, not in the presence or hearing of third persons, makes a slanderous statement about a plaintiff, and thereafter at the request of the plaintiff repeats the statement in the presence and hearing of third persons, such repetition cannot be made the basis of an action for slander.' " (See also 4 Witkin, *op. cit. supra*, § 300, p. 2572; *O'Donnell* v. *Nee*, 86 Fed. 96; *Heller* v. *Howard*, 11 Ill.App. 554.)

This principle applies a fortiori, where a statement made privately to the plaintiff is published solely through the actions and effort of the plaintiff himself. In the case at bar, a confidential letter was sent to Royer, listing as one of the reasons for his dismissal as superintendent, his participation in the preparation and distribution of the fake election campaign flyers. The evidence is uncontradicted that these statements were not made public until Royer himself gave the letter to a local newspaper. This case is therefore virtually indistinguishable from illustration No. 2 of section 583, comment d in the Restatement Second of Torts: "2. A, a school teacher, is summarily discharged by the school board. He demands that the reason for his dismissal be made public. B, president of the board, publishes the reason. *A has consented to the publication though it turns out to be defamatory.*" (Italics added.) Here, Royer's own publication of statements charging his involvement in the distribution of bogus campaign literature rendered such statements absolutely privileged, and his consent cannot be vitiated by a showing of defamatory character.

As to the statements alluding to the postal investigation file, it was shown that Royer published simultaneously alongside the January 19 letter, a "challenge" to appellants "to prove" the truth of the charges. This statement constituted nothing less than a request for the publication of the evidence upon which appellants based their charges. Appellants' March 25 motion was a direct response to that request—they stated that

their charges were established "by evidence and information contained in the postal inspector's file." Since, as in the Restatement illustration, a demand for publication of *reasons* for dismissal will render a subsequent publication of those reasons absolutely privileged, a demand for publication of the *sources* or *evidence* behind those reasons must likewise confer the same absolute privilege upon their later publication.

In summary, it is clear that Royer consented to (1) the publication to third persons of appellants' accusations of his involvement with the forged campaign flyers, and (2) the publication of the assertion that such involvement was proved by evidence in the postal department's investigative file. Since it was these very utterances which Royer claimed libeled him, there was nothing left for the jury to decide. Appellants were entitled to a verdict in their favor as a matter of law.

Royer urges that appellants' publication was not privileged because it somehow exceeded the scope of his consent. This contention is groundless. This is not a case of consent given conditionally or for a limited purpose. (See Rest.2d Torts, *op. cit. supra,* § 583, com. d.) Royer's demand in his open letter was unqualified and therefore so was his consent.

Royer also argues that the defense of consent should not be allowed where there is a showing of "reckless disregard for the truth." This is a misunderstanding of the law. ■ "The privilege conferred by the consent of the person about whom the defamatory matter is published is absolute. The protection given by it is complete, and is not affected by the ill will or personal hostility of the publisher or by any improper purpose for which he may make the publication. . . ." (Rest.2d Torts, *op. cit. supra,* § 583, com. f.) By its very definition, an absolute privilege cannot be overcome by a showing of actual malice; malice is simply not the proper subject of inquiry in such a case. (4 Witkin, *op. cit. supra,* § 294, p. 2565; see also *Pettit* v. *Levy* (1972) 28 Cal.App.3d 484, 488 [104 Cal.Rptr. 650].)

■ One of the primary purposes of the doctrine of consent in defamation law is to prevent a party from inviting or inducing indiscretion and thereby laying the foundation of a lawsuit for his own pecuniary gain. (See Prosser on Torts (4th ed.) p. 784; *Richardson* v. *Gunby* (1912) 8 Kan. 47 [127 P. 533, 536].) The facts and circumstances of the instant case bear testimony to the wisdom of that rule.

██ ██ Were appellants' statements absolutely privileged under Civil Code sections 47, subdivision 1 or 47, subdivision 2?

The March 25 motion, which was alleged to have constituted the libel in this case, was passed by a majority vote at a duly scheduled public meeting of the school district board of trustees. California Civil Code section 47 provides in pertinent part: "A privileged publication or broadcast is one made— [¶] 1. In the proper discharge of an official duty. [¶] 2. In any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding authorized by law . . . ." ██ The privileges conferred by these sections are absolute and are unaffected by the existence of malice. (*Saroyan* v. *Burkett* (1962) 57 Cal.2d 706, 710 [21 Cal.Rptr. 557, 371 P.2d 293]; *Ascherman* v. *Natanson* (1972) 23 Cal.App.3d 861, 864-865 [100 Cal.Rptr. 656]; *Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 379 [295 P.2d 405]; *Frisk* v. *Merrihew* (1974) 42 Cal.App.3d 319, 323 [116 Cal.Rptr. 781, 85 A.L.R.3d 1128].) ██ ██ We have concluded that the statements contained in the March 25 motion and published in the district's Daily Bulletin enjoyed absolute immunity under both sections 47, subdivision 1 and 47, subdivision 2.

### (a) *Discharge of Official Duty*

Section 47, subdivision 1, which has remained unchanged since 1872, confers privileged status upon any statement made by a public official in the course of discharging his official duties. Although the privilege was originally confined to statements made by high ranking officers in the executive branch of government (*Saroyan* v. *Burkett, supra,* 57 Cal.2d at p. 710; see Rest.2d Torts, § 591), the California Supreme Court, in discussing whether to apply the privilege to a county clerk who made statements to the news media concerning improper pressure that was brought upon him to release certain funds, recently stated: "It has been noted by recognized authorities that the purpose of the so-called absolute 'official duty' privilege is to insure efficiency in government by encouraging *policy-making* officials to exercise their best judgment. in the performance of their duties free from fear of general tort liability. (Harper & James, *supra,* at p. 429.) As we discuss below in greater detail we have concluded that defendant Mongan was not exercising policy-making functions when he defamed plaintiff, and thus he is not protected by the absolute privilege contained in Civil Code section 47, subdivision 1." (*Sanborn* v. *Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 413 [134 Cal.Rptr. 402, 556 P.2d 764].)

■ The clear import of this language is that the policy of protecting the free exercise of governmental decision-making mandates that the privilege of section 47, subdivision 1 must be granted not only to "high-level" state executive officers, but also to all state and local officials who engage in the policy-making process. ■ We therefore hold that the privilege of section 47, subdivision 1 protects any statement by a public official, so long as it is made (a) while exercising policy-making functions, and (b) within the scope of his official duties.

It is clear that the publication of the March 25 motion falls within this category. The board of school trustees is an administrative agency created by statute (*Paterson* v. *Board of Trustees* (1958) 157 Cal.App.2d 811, 818 [321 P.2d 825]; *Uhlmann* v. *Alhambra City etc. School Dist.* (1963) 221 Cal.App.2d 228, 234 [34 Cal.Rptr. 341]) and constitutes the local governing body of the school district. (*Frisk* v. *Merrihew, supra,* 42 Cal.App.3d at p. 324.) Appellant trustees were its duly elected members (see Ed. Code, § 35101) and were therefore vested with policy making powers. The March 25 motion was unquestionably within the scope of appellants' official duties. It was made at a public meeting of the board which was authorized by law (Ed. Code, § 35145), and related to a matter properly within the board's jurisdiction—the disciplining of one of its employees. (Ed. Code, § 35026; cf., *Barthuli* v. *Board of Trustees* (1977) 19 Cal.3d 717 [139 Cal.Rptr. 627, 566 P.2d 261].) Therefore, the statements were entitled to an absolute privilege under Civil Code section 47, subdivision 1.

Our conclusion is strongly supported by decisions of the United States Supreme Court and the New York Court of Appeals in cases bearing striking similarities to the one at bar.

In *Barr* v. *Matteo* (1959) 360 U.S. 564 [3 L.Ed.2d 1434, 79 S.Ct. 1335], a scandal developed in the office of a federal agency concerning employees who had been permitted to take their accumulated terminal-leave payments and then be rehired on a temporary basis. (*Id.,* at pp. 565-566 [3 L.Ed.2d at p. 1438].) The affair received widespread newspaper publicity and prompted the acting director of the agency to suspend two of his subordinates, implying in a press release that they were responsible for the misdeeds. (*Id.,* at p. 567 [3 L.Ed.2d at p. 1439].) In a suit for libel by the two officials, the United States Supreme Court held that the director's statement was absolutely privileged. Noting that the director headed "an important agency of the government" and that the agency's integrity had been "severely challenged . . . and given wide publicity,"

the court held that his response "was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively." (*Id.*, at pp. 574-575 [3 L.Ed.2d at p. 1443].) Consequently, the policy of protecting officials from lawsuits which "might appreciably inhibit the fearless, vigorous, and effective administration of [governmental] policies" took precedence. (*Id.*, at pp. 571, 576 [3 L.Ed.2d at pp. 1441, 1444].)

In *Lombardo* v. *Stoke* (1966) 18 N.Y.2d 394 [276 N.Y.S.2d 97, 222 N.E.2d 721] the New York Court of Appeals was confronted with a case virtually on all fours with the present one. There, a city board of higher education issued a press release in response to a publicized accusation that its hiring and promotional policies were tainted with religious bias and prejudice. (276 N.Y.S.2d at p. 99.) The release stated that the accusations of bias were invented by certain professors in order to explain their own lack of academic achievement. The high court affirmed an order dismissing the libel suit of the two professors, stating: "In our view, the members of the defendant Board of Higher Education are such executives and they should be free to report to the public on appropriate occasions 'without the fear of reprisal by civil suit for damages.' " (*Id.*, at p. 101.) The court held that the board's responsibility to inform the public of the merits of charges against it would be seriously hampered if board members "have reason to be apprehensive that their motives for speaking out may be misunderstood and give rise to damages in a subsequent suit for defamation." (*Id.*, at pp. 101-102.) Finally, the court did not agree that the board went beyond the scope of the privilege "in choosing to comment *on the origin as well as the truth* of the accusations." (*Id.*, at p. 102, italics added.)

Royer's reliance on *Lipman* v. *Brisbane Elementary Sch. Dist.* (1961) 55 Cal.2d 224 [11 Cal.Rptr. 97, 359 P.2d 465] as controlling authority in his favor, is misplaced. There, it was alleged that three school board trustees made disparaging statements about the superintendent informally to private individuals and certain members of the press. Since it was undisputed "that none of the alleged improper conduct consisted of or resulted from formal action of the board," the Supreme Court held that the statements were "beyond the scope of the trustees' powers" and that therefore the rule of immunity for discretionary activities by governmental officials acting within the scope of their authority did not apply. (*Id.*, at pp. 231-234.) Here, the alleged defamatory statement was a motion passed at a scheduled public meeting by board members acting in their official capacities. There is no question that the statement emanated from

the "formal action of the board as such." (55 Cal.2d at p. 231.) Under these circumstances, the March 25 motion constituted a "publication . . . made . . . [i]n the proper discharge of an official duty" and fell squarely within the purview of Civil Code section 47, subdivision 1.

### (b) *Legislative, or Other Official Proceeding*

Section 47, subdivision 2, which confers absolute immunity upon all publications made in any "legislative," "judicial" or "other official proceeding authorized by law," has been held applicable to statements made in the course of all legislative, quasi-legislative and administrative board proceedings. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 296, p. 2567.) Thus, slanderous utterances by members of a city council at a regular meeting (*Harnish* v. *Smith* (1956) 138 Cal.App.2d 307 [291 P.2d 532]), letters read in the course of such meetings (*Scott* v. *McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277 [112 Cal.Rptr. 609]), written protests before a planning commission acting on a use variance application (*Whelan* v. *Wolford* (1958) 164 Cal.App.2d 689 [331 P.2d 86]), and letters of complaint written to a board of education which were intended to prompt official action (*Brody* v. *Montalbano* (1978) 87 Cal.App.3d 725 [151 Cal.Rptr. 206]), have all been cloaked with the privilege afforded by this section.

In *Frisk* v. *Merrihew, supra,* 42 Cal.App.3d 319, the court specifically classified meetings of a school district board of trustees as "official proceedings" within the purview of section 47, subdivision 2(3). (*Id.,* at p. 324.) ■ Since, as noted above, the board acts as a local governing body for the school district, we believe that board meetings authorized by law also constitute "legislative proceedings" within the meaning of section 47, subdivision 2(1).

■ The only qualification on the privilege granted to statements made in the course of proceedings enumerated in section 47, subdivision 2 is that the publication have some connection or logical relation to the proceeding. (*Thornton* v. *Rhoden* (1966) 245 Cal.App.2d 80, 90 [53 Cal.Rptr. 706, 23 A.L.R.3d 1152]; *Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818, 824 [106 Cal.Rptr. 718].) In judicial proceedings the added requirement that the statement be "made to achieve the objects of the litigation" has been imposed. (*Bradley, supra,* at pp. 824-825; see also *Albertson* v. *Raboff, supra,* 46 Cal.2d 375, 381.) In *Frisk, supra,* the court held that the requirement that the statement be made in

order to achieve "the object of the proceeding" attaches with equal force to other official proceedings authorized by law. (42 Cal.App.3d at p. 324.)

■ We conclude that the March 25 motion falls within the purview of section 47, subdivision 2. The requirement that the words have some "reasonable relation" to the proceeding is easily met, for here the stated goal of the March 25, meeting was to respond to Royer's "challenge" to prove the accusations against him. Since the motion constituted that very response, it also was issued to achieve the "object" of the board meeting. In this case, Royer was an employee of the district, he was seeking the reasons for an adjudication by the board, and his qualifications and competence as a superintendent were the precise issues at hand. California courts have recognized that an absolute privilege in this area is essential in order to effectuate the important policy of "providing utmost freedom of communication between citizens and public authorities whose responsibility is to investigate wrongdoing." (*Brody* v. *Montalbano, supra,* 87 Cal.App.3d at p. 733; see *Imig* v. *Ferrar* (1977) 70 Cal.App.3d 48, 55 [138 Cal.Rptr. 540].) The March 25 motion was absolutely privileged under this ground.

The judgment is reversed with directions to render judgment for appellants.

Caldecott, P. J., and Christian, J., concurred.

A petition for a rehearing was denied April 11, 1979, and respondent's petition for a hearing by the Supreme Court was denied May 30, 1979. Tobriner, J., did not participate therein.