[No. A028496. First Dist., Div. Two. Sept. 26, 1986.]

GEORGE NEARY, Plaintiff and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents.

COUNSEL

Keker & Brockett, John W. Keker, David J. Meadows, Kong & Yun and Clement J. Kong for Plaintiff and Appellant.

Glynn & Harvey, Glynn, Harvey & Tosney, Robert J. Glynn, Leila H. Moncharsh, Siegfried Hesse and E. Elizabeth Summers for Defendants and Respondents.

OPINION

**ROUSE, Acting P. J.**—Plaintiff, George Neary, appeals from a judgment entered against him on his complaint for libel naming as defendants the Regents of the University of California (university) and individual veterinarians associated with the university, and alleging that defendants defamed him in a report analyzing the reasons for the death of many of plaintiff's cattle. Defendants were granted summary judgment on the ground that publication of the report was absolutely privileged under Civil Code section 47, subdivision 1.[1]

---

[1]All subsequent statutory references are to the Civil Code unless otherwise noted.

The parties have agreed that, for the purpose of the motion for summary judgment, the following facts are undisputed: In July 1978 plaintiff bought a herd of 850 pregnant heifers which he then moved from Klamath Falls, Oregon, to his own ranch near Chico, California. To prevent the spread of scabies, from December 18 through 23, 1978, the California Department of Food and Agriculture (CDFA) sprayed the herd with the chemical toxaphene. In January 1979, when the heifers began calving, at least 95 of them and over 400 of their calves died.

The parties are in disagreement as to how the university came to be involved in plaintiff's cow problem. In late February 1979, defendant Richard McCapes, associate dean of the veterinary school at University of California, Davis (UC Davis), was approached by employees of CDFA and asked if "the school would consider becoming involved in determining the cause of death of these cattle at the Neary Ranch." On February 22, 1979, a state assemblyman formally asked the university to investigate the problem. In any event, several of the individual defendants met with plaintiff at his ranch on March 2, 1979. Plaintiff contends that at that meeting he entered into an agreement with the veterinarians to pay for their professional services in investigating the reason for his cattle losses.

There was substantial press interest in the deaths of the Neary cows, much of it aroused by plaintiff himself, who made his story and his charges against the CDFA spraying widely available. Requests from individual journalists for copies of the university's report were directed both to plaintiff and to the university.

By May 11, 1979, the university had decided that when the veterinarians' report was completed it was subject to public disclosure as a document within the provisions of the California Public Records Act (Gov. Code, § 6251 et seq. (hereafter Public Records Act)). Prior to issuance of the report plaintiff unsuccessfully sought a temporary restraining order to prevent its public disclosure. The report was released June 14, 1979, and made available in its entirety to anyone requesting a copy.

On July 8, 1982, plaintiff filed an action for libel based on allegedly false statements contained in the report. Shortly before the matter was to be tried, defendants moved for summary judgment. Two motions to compel discovery were scheduled to be heard, as well as the motion for summary judgment.

By an order of June 8, 1984, defendants' motion for summary judgment was granted on grounds that publication of the report was absolutely privileged under section 47, subdivision 1. Judgment was entered on the same

date. Plaintiff filed a timely notice of appeal.[2] Plaintiff's motion for reconsideration was denied by an order of August 1, 1984. Plaintiff then filed a timely supplemental notice of appeal.

This case presents the question of whether disclosure by a state entity, a public university, of an internally generated document, which that entity believes to be subject to public disclosure under the Public Records Act, is a privileged publication under the absolute privilege created for official acts by section 47, subdivision 1.

## I. *Official Duty Privilege*

Section 47, subdivision 1, provides that "A privileged publication or broadcast is one made— [¶] 1. In the proper discharge of an official duty." The privilege created by the section is an absolute privilege which is not vitiated by a publication made out of malice or with the intent to do harm. (*Saroyan* v. *Burkett* (1962) 57 Cal.2d 706, 709-710 [21 Cal.Rptr. 557, 371 P.2d 293]; *Frisk* v. *Merrihew* (1974) 42 Cal.App.3d 319, 323 [116 Cal.Rptr. 781, 85 A.L.R.3d 1128].)

The official duty privilege is unquestionably available to high-ranking state officials, such as the governor or individuals whose positions correspond to cabinet officers in the federal government. (*Slaughter* v. *Friedman* (1982) 32 Cal.3d 149, 155 [185 Cal.Rptr. 244, 649 P.2d 886], quoting *Kilgore* v. *Younger* (1982) 30 Cal.3d 770, 778 [180 Cal.Rptr. 657, 640 P.2d 793].) Justifying the privilege is the strong public policy in favor of encouraging officials engaged in policy making to make such decisions free from concern that they will incur liability for torts, including defamation. (*Sanborn* v. *Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 413 [134 Cal.Rptr. 402, 556 P.2d 764].) The official duty privilege has been extended to lower level state or local officials so long as the publication was made while the official was exercising his policymaking function and was acting within the scope of his official duties. (*Royer* v. *Steinberg* (1979) 90 Cal.App.3d 490, 501 [153 Cal.Rptr. 499] [privilege available to elected trustees of school district]; see also *Sanborn* v. *Chronicle Pub. Co., supra,* 18 Cal.3d at pp. 412-413 [language suggesting county clerk could avail himself of the official duty privilege].)

---

[2]Plaintiff's notice of appeal states that he "appeals from the Judgment by Court under CCP § 437c filed June 8, 1984 . . . and from the Order for Entry of Summary Judgment dated June 8, 1984 . . . ." An order granting summary judgment is not an appealable final order. (*Fraser-Yamor Agency, Inc.* v. *County of Del Norte* (1977) 68 Cal.App.3d 201, 207 [137 Cal.Rptr. 118].) However, it is clear from the language of the notice of appeal that plaintiff intended to appeal from the judgment entered upon the court's order and we so construe the notice. (*Helfer* v. *Hubert* (1962) 208 Cal.App.2d 22, 25 [24 Cal.Rptr. 900]; rule 1(a), Cal. Rules of Court.)

Elmer Learn is the executive vice chancellor at UC Davis and reports through the president of the university to its regents, the named defendants. According to Learn's affidavit, it was he who decided, on advice of counsel, that the report once completed was subject to public disclosure under the Public Records Act. In his affidavit Learn described his job duties as the "promulgation and interpretation of policies and procedures within the guidelines established by the Regents and the President." He also asserted that his decision to release the report was "a policy decision."

Apparently, there was no disagreement between the parties that Learn's decision to release the report was a decision within the scope of his duties. However, the parties disagree as to whether Learn occupies a position to which the privilege attaches and, assuming he does, whether his decision to disclose the report was an exercise of his policymaking function.

Learn's position as vice chancellor at the university does not place him at the highest levels of state government. The university, however, is a constitutional department of state government. (Cal. Const., art. IX, § 9; *Goldberg* v. *Regents of the University of California* (1967) 248 Cal.App.2d 867, 874 [57 Cal.Rptr. 463]; 30 Ops.Cal.Atty.Gen. 162, 166 (1957).) Its regents possess such general rule and policymaking powers as are necessary to control the university's operation. (*Goldberg* v. *Regents of the University of California, supra,* 248 Cal.App.2d at p. 874.) To the extent, however, that Learn is the agent of the regents who occupy positions analogous to those of the school trustees in *Royer,* he may indeed fall into the category of a state official who engages in policymaking. (*Royer* v. *Steinberg, supra,* 90 Cal.App.3d 490, 501.)

■ What is less clear is whether, in deciding to release the report, Learn was engaging in his policymaking function. In *Sanborn,* the California Supreme Court discussed when an official is engaged in exercising his policymaking functions by reference to cases construing immunity for discretionary acts under Government Code section 820.2. (*Sanborn* v. *Chronicle Pub. Co., supra,* 18 Cal.3d 406, 413-415.) To be engaged in exercise of his policymaking function the official must reach a basic policy decision, as distinct from an operational decision, after balancing risks and advantages. (*Id.,* at p. 415.) Accordingly, the *Sanborn* court found that discussions by a county clerk with "the public or press regarding the functioning of his office . . . fall within the category of those routine, ministerial duties incident to the normal operations of that office." (*Ibid.*)

■ Summary judgment is properly granted if the affidavits and papers of the moving party would sustain a judgment in his favor and the party opposing the motion has failed to show by affidavit the existence of a triable

issue of fact. (*Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590, 596 [125 Cal.Rptr. 557, 542 P.2d 981].) In ruling upon the motion the court may consider facts to which the parties have stipulated. (*Parker* v. *Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 181 [89 Cal.Rptr. 737, 474 P.2d 689, 44 A.L.R.3d 615].) Affidavits in support of the motion are strictly construed (*Miller* v. *Bechtel Corp.* (1983) 33 Cal.3d 868, 874 [191 Cal.Rptr. 619, 663 P.2d 177]), and thus, while they need not consist solely of evidentiary facts, such affidavits which merely state ultimate facts and conclusions of law will be insufficient. (See *Colvig* v. *KSFO* (1964) 224 Cal.App.2d 357, 364 [36 Cal.Rptr. 701].)

█ In their answer defendants contended that their publication was absolutely privileged under section 47. Accordingly, in Learn's affidavit in support of the motion for summary judgment he asserted the legal conclusion that his decision to release the report was a "policy decision" he made on behalf of the regents. This legal conclusion is not decisive in determining whether or not the official duty privilege shields Learn's decision. We find Learn's affidavit insufficient to establish that his decision was an exercise of his policymaking function.

## II. *Public Records Act*

In Vice Chancellor Learn's affidavit and deposition testimony which were before the court on the motion for summary judgment, he stated that his decision to release the report was made on the advice of counsel that the report was subject to disclosure under the Public Records Act. There was also before the court a letter of May 11, 1979, from university counsel to a reporter at the San Francisco Chronicle in which counsel asserted it was the university's opinion that the report was "subject to public disclosure."

Plaintiff argues that a decision to comply with state law is not, by its nature, a policy decision, but merely a ministerial act. Thus, he argues, whether Learn made the decision himself or merely followed the advice of counsel, the decision was not one determining the university's policy with respect to disclosure of documents, but merely a ministerial decision to follow the policy of disclosure mandated by the Legislature when it passed the Public Records Act.

In making their motion for summary judgment, defendants argued that because they were required by the Public Records Act to publish the report, its publication was an official act within the meaning of section 47, subdivision 1.

A somewhat similar argument was advanced by administrators of a private dental plan in *Slaughter* v. *Friedman* (1982) 32 Cal.3d 149 [185 Cal.Rptr.

244, 649 P.2d 886]. The administrators sought an absolute privilege for communications which they were required under the law to make. (*Id.*, at p. 157.) They relied on section 592A of the Restatement Second of Torts which provides that "One who is required by law to publish defamatory matter is absolutely privileged to publish it." In declining to adopt the privilege created by the Restatement, the *Slaughter* court concluded that the only privileges applicable to libel actions are those delineated in section 47. (*Slaughter* v. *Friedman, supra,* 32 Cal.3d at p. 158.)

Were we not limited to the privileges set out in section 47, a factually analogous decision by the Supreme Court of Minnesota might provide useful guidance. In *Johnson* v. *Dirkswager* (Minn. 1982) 315 N.W.2d 215, the Commissioner of Public Welfare's disclosure of reasons for the termination of a state hospital employee was found to be absolutely privileged as an act of a high state official in accord with the state's Data Privacy Act which required disclosure of such information to the public. (*Id.*, at pp. 220-223.) In reaching this result, however, the Minnesota court relied upon Restatement section 529A, something we may not do in light of our state Supreme Court's ruling that section 47 identifies those privileges applicable to defamatory publications. (*Slaughter* v. *Friedman, supra,* 32 Cal.3d 149, 158.) It appears that California law is more in accord with the principle annunciated in *Pulliam* v. *Bond* (Mo. 1966) 406 S.W.2d 635, 640, namely, that while it has been held that there is a tendency to extend the absolute privilege to occasions where the communication is provided for and required by law, the class or occasion where the publication of defamatory matter is absolutely privileged is confined to cases in which the public service or the administration of justice requires complete immunity. (*Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818, 824 [106 Cal.Rptr. 718].)

 Defendants argue that it would be unfair to expose them to liability for a publication required under the law. While their contention is appealing, they made no showing below that, in fact, the Public Records Act did compel disclosure of the report. The act permits a public entity to withhold disclosure where it determines that the public interest weighs in favor of nondisclosure. (Gov. Code, § 6255.) Merely asserting that university counsel believed the report to be subject to disclosure under the act begs the question of whether that was the reason the report was disclosed.

Except for the legal opinion of the university's counsel, there was no evidence that the report was subject to disclosure. Moreover, there was evidence that it was university policy at UC Davis Veterinary Medical Teaching Hospital not to disclose information about client-owned animals. There was also evidence, both from Neary and from some of the veterinarians, that they had a veterinarian-client relationship. Defendant Dr. Ben

Norman expressed ethical qualms about publicly releasing any more of the report than that dealing with the effect of toxaphene on the ground that "problems of one rancher are not discussed with other people." In short, just because the university claimed a legal basis for disclosing the report there was still a triable issue of fact as to why the university released the report.

Because we find that there are triable issues of fact as to the availability of an absolute privilege under section 47, subdivision 1, we conclude the trial court erred in granting defendants' motion for summary judgment.

### III. *Discovery*

During plaintiff's deposition of Learn, the vice chancellor repeatedly claimed attorney-client privilege in response to questions about how and when the decision to disclose the report was made. Plaintiff argues that, in claiming the privilege as to how the decision to disclose was made, defendants have denied him an opportunity to establish facts essential to opposing the motion for summary judgment.

Plaintiff argues that the summary judgment motion should have been denied under Code of Civil Procedure section 437c, subdivision (h), which provides, in pertinent part: "If it appears from the affidavits submitted in opposition to the motion that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit . . . discovery to be had . . . ."

Plaintiff made two motions to compel discovery—including discovery of matters defendant contended were subject to attorney-client privilege. The court dropped both motions because plaintiff failed to comply with rule 335(a), California Rules of Court, which requires that "A motion to compel . . . shall be accompanied by a separate document which sets forth each interrogatory, request, or question as to which further answer is requested, the answer, and the factual and legal reasons for compelling it. Material shall not be incorporated by reference." At the hearing the trial court explained that it needed to have this separate listing of the information sought and the reasons the information was relevant in order to rule appropriately as to each question. If plaintiff was disadvantaged by his own failure to adequately support his motions to compel discovery, he cannot claim that the trial court erred in refusing to delay its ruling on the summary judgment motion.

Inasmuch as we reverse the summary judgment, plaintiff will have an opportunity to make another motion to compel discovery of matters which

defendants contend are within the attorney-client privilege. Plaintiff can then show that these matters have been put at issue by defendants' affirmative defense of privileged publication. (See *Mitchell* v. *Superior Court* (1984) 37 Cal.3d 591, 609 [208 Cal.Rptr. 886, 691 P.2d 642].)

## IV. *Liability of Report's Authors*

■ Plaintiff claims that, even if the official duty privilege immunizes the university from liability for publication of the report by its release to the public, the individual authors of the report are not covered by the official duty privilege. He contends that it was error to grant summary judgment as to them. Plaintiff makes this argument on two grounds: first, he argues the official duty privilege of section 47 does not protect the veterinarians who were not high officials and were not making policy but were merely summarizing the results of their scientific inquiry; second, he argues that even if the university's publication (disclosing the report to the public) is protected by the privilege, the veterinarians are still liable for their own publication of any defamatory statements contained in the report.

The rationale underlying the official duty privilege is to permit policy-making officials freedom to chart policy without concern that they may be incurring civil liability for such decisions. (*Sanborn* v. *Chronicle Pub. Co.*, *supra*, 18 Cal.3d 406, 413.) Under this rationale the scope of the official duty privilege should be no broader than necessary to protect appropriate officials when they are engaged in policymaking.

The individual authors of the report were engaged in the process of ascertaining the reason or reasons for the death of Neary's cattle. They were doing research, not making policy about research. While there are strong public policy arguments in favor of protecting freedom of inquiry in the university, none of the absolute privileges established by section 47 shields this research activity.[3] Accordingly, we find that any publication made by

---

[3]Section 47 makes absolutely privileged publication made in the course of discharging an official duty (subd. 1) (*Saroyan* v. *Burkett, supra*, 57 Cal.2d 706, 710), or a publication made in a legislative, judicial, quasi-judicial, or other proceeding authorized by law (subd. 2) (*Ascherman* v. *Natanson* (1972) 23 Cal.App.3d 861, 864-865 [100 Cal.Rptr. 656]), or publication of a fair and true report of a public meeting lawfully convened for a lawful purpose (subd. 5(1)) (*Williams* v. *Daily Review, Inc.* (1965) 236 Cal.App.2d 405, 418 [46 Cal.Rptr. 135]). Subdivision 5(2) also provides an absolute privilege if "the publication of the matter complained of was for the public benefit."

On its face, section 47, subdivision 5(2), might be construed as protecting publication if it is made in the public benefit so long as it is fair and truthful. (See *H & M Associates* v. *City of El Centro* (1980) 109 Cal.App.3d 399 [167 Cal.Rptr. 392] [city manager notifies press, lenders and other government agencies of termination of water service but is not

the individual authors of the report is not privileged by the official duty privilege should it be found applicable to Learn's decision to publicly disclose the document.

## V. *Republication*

■ Publication is, of course, a term of art and one of the elements of the tort of libel. For publication to occur the defamatory matter must be communicated to a third party who understands the defamatory meaning and its applicability to the plaintiff. (*Farr* v. *Bramblett* (1955) 132 Cal.App.2d 36, 46-47 [281 P.2d 372].) Ordinarily, the originator of a defamatory statement is liable for each repetition of the statement if he could reasonably foresee such repetition was likely to occur. (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 268, 281 [208 Cal.Rptr. 152, 690 P.2d 625]; *Di Giorgio Corp.* v. *Valley Labor Citizen* (1968) 260 Cal.App.2d 268, 273 [67 Cal.Rptr. 82].)

■ In his complaint plaintiff alleges republication of the report in newspapers and on television. Since we have concluded that the authors of the report are not covered by the official duty privilege, which may shield Learn's decision to disclose it, the authors could be liable for publication and republication. There was uncontroverted evidence before the trial court that at least one of the report's authors, McCapes, actually foresaw the likelihood of republication. At his deposition McCapes testified that he "assumed" the report he was working on in May "was going to be reviewed very publicly." He also acknowledged that he had been told by university counsel "[i]f we wrote a report, everything we put in that report was discoverable, plus results of lab tests and all the original files, everything, the files and everything were disclosable." On the summary judgment motion there was evidence before the court establishing that the authors had foreseen the likelihood of republication. Thus, there was a triable issue of fact as to the liability of defendant authors which should have precluded summary judgment as to them.

---

relaying contents of public meeting].) The legislative history makes it clear, however, that subdivision 5(2) must be read to mean a "fair and true report" of a *public meeting* when the publication is for the public benefit.

As initially adopted in 1895, subdivision 5 read, "By a fair and true report, without malice, of the proceedings of a public meeting, if such meeting was lawfully convened for a lawful purpose and open to the public, or the publication of the matter complained of was for the public benefit." (Stats. 1895, ch. 163, § 1, pp. 167-168.) In 1927, without any change in the syntax, the numbers (1) and (2) were inserted into the section. (Stats. 1927, ch. 866, § 1, pp. 1881-1882.) The privilege created by the subdivision was made absolute, rather than qualified, in 1945 when the Legislature deleted the words "without malice." (Stats. 1945, ch. 1489, § 3, p. 2763.)

The judgment is reversed and the matter remanded to the trial court for further proceedings.

Smith, J., and Benson, J., concurred.

Respondents' petition for review by the Supreme Court was denied December 17, 1986. Bird, C. J., was of the opinion that the petition should be granted.