[No. D003637. Fourth Dist., Div. One. Nov. 18, 1986.]

KENNETH KELLY, Plaintiff and Appellant, v.
WILLIAM MORROW & COMPANY, INC., et al.,
Defendants and Respondents.

COUNSEL

Peter H. Karlen, Joseph D. Schloss, Sr., and Frank Zotter, Jr., for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, John A. Sturgeon and Timothy B. Taylor for Defendants and Respondents.

OPINION

**BUTLER, J.**—Joseph Wambaugh wrote and others published the book "Lines and Shadows," an account of the activities of San Diego police officers assigned to the Border Alien Robbery Force (BARF), a unit formed to control criminal activities in the Mexican border area. Police Officer Kenneth Kelly was a member of the BARF squad.

Following publication of the book, Kelly sued Wambaugh and publishers William Morrow & Company, Inc., Bantam Books, Inc., Perigord Press

(collectively the Publishers) and Brilliance Corporation, distributor of audio-cassette tapes of the book. Kelly sought damages for invasion of privacy, libel, slander, breach of contract, fraud, and negligent infliction of emotional distress, claiming the book contained false statements and inaccuracies, portrayed him as frivolous, flippant and irresponsible toward his job as a police officer, and related fictitious events.

The court sustained without leave to amend demurrers filed by Wambaugh and the Publishers[1] on the ground Kelly consented to publication of the book when he signed a personal depiction waiver. He appeals the order of dismissal and we reverse and remand, holding the court erred in concluding the waiver as a matter of law constituted a consent to publication of matters claimed by Kelly to be defamatory, libelous and an invasion of his privacy.

I

We reach a narrow issue on this appeal—whether Kelly consented to the publication of the claimed offensive material when he signed the personal depiction waiver set out below for which he was paid $5,000.

"PERSONAL DEPICTION WAIVER

"For valuable consideration received, I hereby grant to you, your successors, licensees and assigns the exclusive and irrevocable right and license to use, simulate and portray my likeness, activities, experiences and career and to use my name in and in connection with the production, exhibition, advertising and other exploitation of a motion picture, photoplay or photoplays and book, or other printed material. The rights herein granted to you shall include the right to depict and/or portray me and such other persons to such extent and in such manner, either factually or fictionally as you in your discretion and pursuant to any contract with me may determine and the right to distribute, exhibit or otherwise exploit any such photoplay by any method and in any manner, including theatrically and nontheatrically and by means of television or otherwise. Nothing herein contained shall be deemed to obligate you to exercise any of the rights, licenses and privileges herein granted to you.

"Signed this 2 day of Sept., 1982, in the City of National City, County of San Diego, State of California.

"[s/] Kenneth Kelly

"MEMBER OF BARF"

---

[1]Brilliance filed a demurrer after the court's ruling and is not involved in this appeal. The court sustained with leave to amend the causes of action concerning the audio-cassettes so far as Wambaugh and the Publishers were concerned.

## II

The form recites "I hereby grant to you, your successors, licensees and assigns . . . ." The second person pronoun as used here and elsewhere is not identified anywhere in the waiver. The waiver is first mentioned in the complaint's fourth cause of action, breach of contract. Kelly alleges he orally agreed with Wambaugh and Doe defendants to grant interviews to the defendants about his police officer activities and then signed the waiver with the understanding those designated defendants would not exceed the rights given in the waiver. The complaint then goes on to allege Wambaugh and the Doe defendants agreed to depict Kelly either factually or fictionally as to incidents related in the interviews.

Following long-established rules in considering appeals from judgments dismissing complaints on the sustaining of demurrers without leave to amend, we take as true all of the well-pleaded averments in the complaint and inferences reasonably deduced from them. We conclude the waiver was directed to Wambaugh and the designated Doe defendants.

The waiver also extends to the Publishers as successors, licensees or assigns of Wambaugh. The first three causes of action (invasion of privacy, libel and slander) all characterize the Publishers as publishers and distributors of the book. As such, we draw the inference they are Wambaugh's successors, licensees or assigns. The word "you" in the waiver includes Wambaugh and the Publishers. We turn to the complaint.

## III

The complaint states causes of action sounding in defamation, libel and slander. (*Selleck* v. *Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1132, 1133-1134 [212 Cal.Rptr. 838].) Kelly pleads the book invades his privacy in that fictitious statements are attributed to him, his personal characteristics are held up to ridicule, and he is portrayed as frivolous, flippant, irresponsible and engaged in criminal activities. Kelly attaches extracts from the book to demonstrate these charges. Fairly construed, these extracts depict Kelly as lecherous, heavy-drinking, promiscuous, unfaithful and untruthful to his wife, loud, raucous, blasphemous, profane, acting as a pimp for his fellow officers, and vacuous. Kelly labels marital discord episodes written vividly and profusely as false as well as happenings on the border during BARF forays. Kelly denies the attribution to him of remarks concerning BARF squad members as being psychotic, alcoholic, dangerous, and violent.

In his libel and slander causes of action, Kelly alleges a number of statements in the book are false. The breach of contract and fraud causes

of action plead the waiver granted Wambaugh the right to depict Kelly factually or fictionally but not both. Kelly claims the book is half factual and half fictional and the waiver does not constitute a consent to the mix of fact and fiction in the book.

Demurring, Wambaugh and the Publishers asserted, and the court agreed, the waiver constituted a complete defense to Kelly's claims. We examine the arguments in detail.

## IV

Kelly claims the waiver[2] requires the defendants to elect a factual or a fictional account of his BARF adventures because the word "or" requires a choice between the two and prohibits their commingling into a factual-fictional account.

Rules of construction allow the disjunctive "or" be accorded its ordinary meaning so as to reconcile potential conflicts and give effect to each provision separated by the disjunctive. (*People* v. *Anderson* (1972) 6 Cal.3d 628, 636-637 [100 Cal.Rptr. 152, 493 P.2d 880].) The use of the word "or" in a contract phrase "protect or collect" in its ordinary sense marks an alternative such as "either this or that." To give the word another meaning such as "and" is sanctioned only when such construction is found necessary to carry out the obvious intent of the parties to a contract, when that intent "may be gleaned from the context in which the word is used." (*Houge* v. *Ford* (1955) 44 Cal.2d 706, 712 [285 P.2d 257]; see *Gaillard* v. *Natomas Co.* (1985) 173 Cal.App.3d 410, 415 [219 Cal.Rptr. 74].)

Giving, for the moment, the ordinary meaning to the word "or" we turn to the words thus used disjunctively—factually, fictionally. An adverb is used as a modifier of a verb, an adjective, another adverb, a preposition, a phrase, a clause, or a sentence. An adverb expresses some relation of manner or quality. (Websters Third New Internat. Dict., Unabridged (1981) p. 31.)

Factually and fictionally are adverbs. Webster defines factual: "[O]f, relating to, or concerned with facts . . . restricted to, involving, or based on fact esp. as opposed to the imaginative or theoretical . . . ." (At p. 813.)

A fact is: "[S]omething that has actual existence . . . an occurrence, quality, or relation the reality of which is manifest in experience or may be inferred with certainty . . . ." (At p. 813.)

---

[2]Kelly attributes authorship of the waiver to Wambaugh. The defendants claim Kelly's lawyer drafted the document, citing in support of the contention their bare assertion to that effect. As the complaint is silent on authorship and we are confined to its four corners, we disregard this fingerpointing.

Fiction, on the other hand, is: "[T]he act of creating something imaginary : a fabrication of the mind . . . an intentional fabrication : a convenient assumption that overlooks known facts in order to achieve an immediate goal . . . an unfounded, invented, or deceitful statement . . . fictitious literature (as novels, tales, romances) . . . a work of fiction; *esp.* : NOVEL . . . ." (At p. 844.)

Fact[3] and fiction[4] are thus at opposite poles.

Keeping in mind we deal here with complaint allegations deemed to be true as are reasonable inferences to be drawn from them, it is apparent the book includes fact and fiction. Kelly attaches pages of the book with underscored passages claimed to be actionable. It follows those portions not so marked or objected to may be deemed factual.

 We return to Kelly's contention—he consented to a depiction, either factually or fictionally, but not both. As we have seen, the disjunctive "or" is to be given its ordinary meaning of "either one or the other" to give effect to each provision of a document, yet the disjunctive may be given the meaning "and" when necessary to carry out the intent of the parties as "gleaned from the context in which the word is used." (*Houge* v. *Ford, supra,* 44 Cal.2d 706 at p. 712.)

The waiver is replete with suggestions Kelly's depiction is not limited to either a factual or fictional portrayal. The right and license given to Wambaugh was "to use, simulate[5] and portray my likeness, activities, experiences and career" and in the exercise of those rights "to depict, and/or portray me and such other persons to such extent and in such manner, either factually or fictionally . . . ."

"Depict" means to form a likeness by drawing or painting, or in other ways as tapestries or carvings and to portray in words (Webster's Third New

---

[3]"What I want is Facts. Teach these boys and girls nothing but Facts. Facts alone are wanted in life. Plant nothing else, and root out everything else." (Charles Dickens, Hard Times (1854), bk. I, ch. 1.)

[4]"'Tis strange—but true; for truth is always strange; Stranger than fiction." (Lord Byron.) "Truth is stranger than fiction, but not so popular." (Anonymous.)

[5]"Simulate" means to imitate, represent, feign, to give the appearance or effect of: "felt obliged to [simulate] reluctance, and the air of having had her hand forced—Edith Wharton . . . to [simulate] real mink, the muskrat pelts are let out—Pete Barrett . . . pegs in the oak flooring further [simulate] pioneer construction—*Amer. Guide Series: Ark.* . . .: to have the characteristics of: RESEMBLE . . . the raised forelegs of the praying mantis [simulate] the attitude of a man at prayer . . . mycoses . . . which may involve the lungs and [simulate] tuberculosis—J.B. Amberson . . . *vi:* to make believe: PRETEND (while the unseen musician plays, the actor [simulates]." (Webster's Third New Internat. Dict., *op. cit. supra,* at p. 2122.)

Internat. Dict., *op. cit. supra,* at p. 605.) "Portray" is to represent by drawing or painting, to make a picture or image, and "to describe in words: present a verbal picture of (a novelist who [portrays] life the way most of us see it—Bernice Matlowsky) . . . to play the role of: represent dramatically . . . ." (*Op. cit. supra,* at p. 1769.)

A book about Kelly's life and BARF experiences in wholly factual terms would be a combination of autobiographical data typically found in a "Who's Who" of Podunk and a police report on a BARF incident. While occasionally interesting, such factual stuff does not find its way to the bestseller lists and we surmise the subject is not paid $5,000 for the right to use his name. The use in the waiver of the words "simulate," "depict," "portray" and our own reading of historical documentaries and novels compel the conclusion Kelly consented to publication of a mixed bag of fact and fiction. The demurrer to the breach of contract cause of action was correctly sustained.

 We reach the last questions. Did Kelly consent to be defamed, libeled, slandered? Did he consent to an invasion of his privacy and resultant loss of wife, job and reputation?[6]

## V

The complaint pleads defamation, libel and slander. Defamation is effected by libel or slander (Civ. Code, § 44). Libel is defined as: "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) Slander is a false and unprivileged publication, orally uttered, which among other things, tends directly to injure one in respect to his office (Civ. Code, § 46). Common to both torts are falsity and lack of privilege. The elements of the torts having been admitted by the demurrer, we turn to the question whether the waiver on its face constitutes a consent conferring an absolute privilege and thus a defense to Kelly's charges. (*Royer v. Steinberg* (1979) 90 Cal.App.3d 490, 498 [153 Cal.Rptr. 499].) Section 583 of the Restatement Second of Torts states as a general principle: "Except as stated in § 584, the consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation." Section 584 allows an honest inquiry by the defamed person to inquire into

---

[6]As we have earlier pointed out, Kelly's allegations the passages in the book claimed to be offensive state causes of action sounding in these torts. (*Selleck* v. *Globe International, Inc., supra,* 166 Cal.App.3d 1123, 1131-1134.)

the defamatory publication. That inquiry is not a defense in an action for the republication by the defamer. The extent of the privilege conferred by consent under section 583 is determined by the language or acts by which the consent is given in the light of the surrounding circumstances. "If the person to whom the consent is given reasonably interprets the language used or the acts done as a consent to the publication of the defamatory matter to any person, at any time, in any manner and for any purpose, the publication however made is privileged. On the other hand, a consent may be limited to a publication to a particular person or at a particular time or for a particular purpose. If so, the publication is privileged only if made within those limitations. . . . *So too, if the consent is given to the publication only upon a particular contingency, a publication is not privileged unless the contingency occurs.*" (Rest.2d Torts, § 583, com. d., pp. 240-241, italics added.) Looking at the last italicized sentence of section 583, comment d, the rights given in the waiver include the right to depict "and/or" portray Kelly and other persons "to such extent and in such manner, either factually or fictionally as you in your discretion *and pursuant[7] to any contract with me may determine* . . . ." (Italics added.) Kelly says his consent was thus given to publication upon a contingency which has not occurred, i.e., the formation of an agreement to determine the extent and the manner of Wambaugh's depiction of him. Kelly's brief on appeal argues industry practice affords the subject of a book the opportunity for pre-publication review which the underlined provision was intended to assure.

As we deal here with a demurrer, and the complaint is silent as to industry practice, the argument is not helpful. However, the phrase "and pursuant to any contract with me may determine" appears to be a limitation upon the exercise of Wambaugh's discretion in the factual or fictional depiction "and/or" portrayal of Kelly and is an addition to the ambiguities and uncertainties so far emergent in our analysis. We continue our inquiry into the scope of the consent given in the waiver.

*Royer* v. *Steinberg, supra,* 90 Cal.App.3d 490, dealt with the effect of a consent to publication of defamatory material. There, a school board sent a confidential letter to a superintendent specifying reasons for his demotion. The superintendent published the letter and challenged the board to prove the charges. The board's detailed response was published. The court held the superintendent's publication of the letter invited publication of the response and found as a matter of law the superintendent had consented to the utterances claimed to be actionable. *Royer* holds a consent to publication of defamatory matter is absolute: "Royer also argues that the defense of

---

[7]"[I]n the course of carrying out : in conformance to or agreement with : according to . . . ." (Webster's Third New Internat. Dict., *op. cit. supra,* at p. 1848.)

consent should not be allowed where there is a showing of 'reckless disregard for the truth.' This is a misunderstanding of the law. 'The privilege conferred by the consent of the person about whom the defamatory matter is published is absolute. The protection given by it is complete, and is not affected by the ill will or personal hostility of the publisher or by any improper purpose for which he may make the publication. . . .' (Rest.2d Torts, *op. cit. supra,* § 583, com. f.) By its very definition, an absolute privilege cannot be overcome by a showing of actual malice; malice is simply not the proper subject of inquiry in such a case. (4 Witkin, [Summary of Cal. Law (8th ed. 1974) Torts], § 294, p. 2565; see also *Pettitt* v. *Levy* (1972) 28 Cal.App.3d 484, 488 . . . ." (*Royer, supra,* at p. 499.) The rule in *Royer* is expressed in other jurisdictions. The request to publish defamatory matter gives rise to an absolute privilege and constitutes a complete defense in libel and slander cases. (*Ernst* v. *Indiana Bell Telephone Co.* (Ind.App. 1985) 475 N.E.2d 351; *Dominguez* v. *Babcock* (Colo.App. 1984) 696 P.2d 338; *Johnson* v. *City of Buckner* (Mo.App. 1980) 610 S.W.2d 406; *Merritt* v. *Detroit Memorial Hospital* (1978) 81 Mich.App. 279 [265 N.W.2d 124]; *Zuniga* v. *Sears, Roebuck & Co.* (1983) 100 N.M. 414 [671 P.2d 662]; *Ryder Truck Rentals* v. *Latham* (Tex.Civ.App. 1979) 593 S.W.2d 334.)

*Royer* and the cited cases concern specific libelous or slanderous statements invited to be made by a person claimed to be defamed in circumstances which constitute a consent to the publication by the defamer. Here, we deal with a waiver consenting to publication of a book mixing fact with fiction. We have seen fiction is an "intentional fabrication : a convenient assumption that overlooks known facts . . . ." It is also "an unfounded, invented, or deceitful statement" which assumes "a possible thing as a fact irrespective of the question of its truth . . . ." (Webster's Third New Internat. Dict., *op. cit. supra,* at p. 844.) And fact is the actual existence of an occurrence, a reality, as opposed to fiction.

The book is rooted in fact and bears fictional fruit. Kelly is identified by his true name, his occupation as a police officer, his membership in BARF. His complaint concedes part of the book is factual. He argues other passages are false and many are defamatory of him. "Lines and Shadows" is in the genre roman à clef, "a novel in which real persons or actual events figure under disguise." (Webster's Third New Internat. Dict., *supra,* at p. 1969.)[8]

While fiction is an accordion word encompassing the sweep of literary works, glorious and gothic, we cannot say as a matter of law the rights

---

[8]Examples come readily to mind. The movie Citizen Kane depicting the life of William Randolph Hearst; M. Puzo, The Godfather; J. Susann, Valley of the Dolls; W. L. Stevenson, Enigma; popular biographies, historical novels and spy stories are in the category.

given in the waiver include a license to defame, slander and libel Kelly. The waiver is not clear or certain. The waiver is ambiguous. The waiver does not suggest Kelly was aware he waived his rights to privacy. We remarked on the requirement for certainty of waivers in *In re Marriage of Moore* (1980) 113 Cal.App.3d 22 [169 Cal.Rptr. 619] (cited with approval in *In re Marriage of Vomacka* (1984) 36 Cal.3d 459, 469 [204 Cal.Rptr. 568, 683 P.2d 248]): "Waiver requires a voluntary act, knowingly done, with sufficient awareness of the relevant circumstances and likely consequences. [Citation.] There must be actual or constructive knowledge of the existence of the right to which the person is entitled. [Citation.] The burden is on the party claiming a waiver to prove it by evidence that does not leave the matter doubtful or uncertain and the burden must be satisfied by clear and convincing evidence that does not leave the matter to speculation. [Citation.] This rule particularly applies to cases involving a right favored in law such as, in this case, the right to retain lawful property entitlements and support." (*In re Marriage of Moore, supra,* 113 Cal.App.3d 22 at p. 27.) We conclude the extent of the privileges conferred by the waiver must be determined in the light of the circumstances in which it was executed. Kelly's entitlement to a prepublication review under the terms of the waiver must likewise be considered. Whether Kelly sold his birthright to privacy for a mess of pottage when he signed the waiver can only be determined by a trier of fact.

The judgment entered on the contract cause of action is affirmed, judgment entered on all other causes of action is reversed, and the trial court is instructed to overrule the demurrers and give the defendants 30 days to answer or otherwise plead to the complaint. Each party to bear their own costs.

Wiener, Acting P. J., and Benke, J.,* concurred.

A petition for a rehearing was denied December 8, 1986, and respondents' petition for review by the Supreme Court was denied February 11, 1987.

---

*Assigned by the Chairperson of the Judicial Council.