Filed 4/11/22  Hill v. Doc Shop Productions CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JAMISON HILL, et al.,<br><br>        Plaintiffs and Respondents,<br><br>        v.<br><br>DOC SHOP PRODUCTIONS, INC., et al.,<br><br>        Defendants and Appellants. | B305617<br><br>(Los Angeles County Super. Ct. No. 19STCV27884) |

        APPEAL from an order of the Superior Court of the County of Los Angeles, Susan Bryant-Deason, Judge.  Affirmed.

        Mitchell Silberberg & Knupp, Emily F. Evitt, Aaron M. Wais, and Gabriella A. Nourafchan, for Defendants and Appellants.

        Ervin Cohen & Jessup, Randall S. Leff, Russell M. Selmont, and Matthew S. Blum for Plaintiffs and Respondents.

# I. INTRODUCTION

This action arose from the production and airing of the Netflix series *Afflicted*. Seven people depicted in that series sued defendants[1] for defamation, invasion of privacy (false light), and fraud. Defendants moved to strike the complaint under the anti-SLAPP statute,[2] but the trial court denied the motion.

On appeal, defendants contend plaintiffs failed to make a prima facie showing sufficient to overcome the consent/release defenses to the defamation and false light claims. Defendants also contend plaintiffs failed to demonstrate that their defamation, false light, and fraud claims had minimal merit. We affirm.

# II. FACTUAL BACKGROUND

A. *The Parties*

1. <u>Plaintiffs</u>

Four of the plaintiffs featured in *Afflicted* suffered from chronic illnesses and the other three provided support and care for the ill plaintiffs. Jill Edelstein (Edelstein), a licensed psychotherapist and clinical social worker, suffered from

---

[1] The parties are identified in section II., A., below.

[2] Code of Civil Procedure section 425.16 (section 425.16), "[f]amiliarly known as the anti-SLAPP statute, . . . allows defendants to seek early dismissal of unmeritorious claims arising from protected speech and petitioning activities." (*Bonni v. St. Joseph Health Systems* (2021) 11 Cal.5th 995, 1004.)

Hashimoto's thyroiditis, an autoimmune disease, and had been diagnosed with multiple chemical sensitivity. Janine Feczko (Feczko) was Edelstein's partner and later her wife.

Pilar Olave (Olave) suffered from common variable immunodeficiency disorder, a life-threatening disease, and myalgic encephalomyelitis, also known as chronic fatigue syndrome.

Bekah Dinnerstein (Bekah)[3] suffered from acute mold sensitivity, brought on by a bout with Lyme disease. She also suffered from common variable immunodeficiency disorder and several other conditions. Nick Dinnerstein (Nick), Bekah's brother, acted as her caretaker during the filming of *Afflicted*. Jesse Bercowetz (Bercowetz), Bekah's boyfriend, was her caretaker for nearly two years prior to filming.

Jamison Hill (Hill) suffered from myalgic encephalomyelitis.

2.    Defendants

Defendants were three of the individuals and two of the companies involved in the creation and production of *Afflicted*. Daniel Partland (Partland) was the president of Doc Shop Productions, Inc. (Doc Shop), a production company. Partland created and was the executive producer of *Afflicted*.

Peter LoGreco (LoGreco) was an executive producer of and the showrunner for *Afflicted*.

Stephanie Lincoln (Lincoln) was one of the field producers for *Afflicted*.

---

[3]    Because plaintiffs Bekah and Nick Dinnerstein share the same last name, we refer to them by their first names.

Netflix, Inc. (Netflix) hired Doc Shop to produce *Afflicted* and distributed *Afflicted* through its subscription streaming video service. According to plaintiffs, *Afflicted* was a joint production between Netflix and Doc Shop.

B. *Origins of the Afflicted Series*

Partland developed "the idea for *Afflicted*" based on his experience with his wife's chronic illness. He created the production company Vivify Pictures, Inc. (Vivify), a wholly owned subsidiary of Doc Shop, for purposes of making *Afflicted*. In April 2017, he hired LoGreco as the showrunner to oversee the day-to-day operations of the show.

C. *The Releases*

In preparation for the start of filming, LoGreco was responsible for obtaining "a personal release from each of the subjects, as well as all of their friends and family members who appeared in the show." The agreements LoGreco required each plaintiff to sign were entitled: "**Personal Release**" and began with the following caveat at the top of the document, set off in a box, in bolded, all-capital letters, and in larger type face than the text: "**THIS IS A LEGAL DOCUMENT AFFECTING YOUR RIGHTS AND RESPONSIBILITIES. DO NOT SIGN UNTIL YOU HAVE COMPLETELY READ THE FOLLOWING:** . . . ."

The first paragraph of the release recited the consideration plaintiffs would receive for their agreement to participate in the production of *Afflicted*, i.e., the potential that the producer,

Vivify, would "includ[e plaintiffs] in the television program currently entitled '[*Afflicted*]' . . . ."

The release then provided that, in exchange, plaintiffs would "grant to [Vivify] . . . the irrevocable right (but not the obligation) to film, tape and/or photograph, record . . . , exhibit, edit, modify, . . . [and] use . . . [plaintiffs'] name[s], voice[s], likeness[es], conversations . . . (collectively '[r]ecordings') in any manner, in all media . . . . [Plaintiffs] agree that [Vivify] is the sole owner of all the results and proceeds of the [r]ecordings. [Vivify] shall also have the *unrestricted right to edit the content and text* of [*Afflicted*] and the [r]ecordings in any manner or form . . . ." (Italics added.)

Plaintiffs also expressly acknowledged that *Afflicted* "may include, among other things, documentary-style or 'behind the scenes,' dramatic, humorous, *embarrassing, humiliating*, and satirical elements" and that they "may reveal information about [themselves] of a personal, private, intimate, surprising, *disparaging, embarrassing, or unfavorable nature, which may be factual and / or fictional.*" (Italics added.)

Plaintiffs further acknowledged that their "appearance, depiction, and/or portrayal in connection with [*Afflicted*], and [their] actions and/or the actions of others, may be *disparaging, defamatory, embarrassing, or of an otherwise unfavorable nature to [plaintiffs] and may expose [them] to public ridicule, humiliation, or condemnation,* and that [*Afflicted*] may have a variety of natural or manufactured elements." (Italics added.)

After also confirming that they had "voluntarily agreed to participate in [*Afflicted*] of [their] own free will with full and complete understanding of the risks," plaintiffs agreed to release and hold harmless a broad category of parties from "any and all

5

claims, judgments, interest, demands, losses, liabilities, causes of action, or costs of any kind (including reasonable attorney's fees and court costs) (collectively, [c]laims) that [they] may have arising out of or in any way resulting from [their] participation in [*Afflicted*], and the use or reuse of the [r]ecordings, and [they] agree[d] not to make any claim against the [r]eleased [p]arties as a result of [their] participation in [*Afflicted*] and/or in connection with any use or reuse of the [r]ecordings (including without limitation, claims based upon *defamation, invasion of privacy, emotional distress, false light, and/or publicity*) . . . ."  (Italics added.)

## III.   PROCEDURAL BACKGROUND

On August 7, 2019, plaintiffs filed their complaint against defendants, asserting five causes of action[4] for defamation, false light, unjust enrichment, injunctive relief, and fraud.  In summary, plaintiffs contended that they "were duped by [d]efendants into participating in a salacious reality television program that questioned the existence of chronic illnesses and portrayed [p]laintiffs as lazy, crazy, hypochondriacs and/or malingerers who were deserving of scorn and who in fact have received scorn and abuse because of [d]efendants' cruel and duplicitous actions."

On October 28, 2019, defendants filed their answer to the complaint, in which they asserted, among others, affirmative defenses of consent and release, based on plaintiffs' execution of

---

[4]     As defendants point out, plaintiffs' claims for an injunction and unjust enrichment are not independent causes of action, but rather requests for equitable remedies.

the releases.  On that same date, defendants also filed a motion to strike pursuant to section 425.16.

Plaintiffs opposed the motion, arguing that their claims were not based on an issue of public interest and that there was a likelihood that they would prevail on each of their claims. Regarding the consent and release defenses, plaintiffs argued that there was minimal merit to their contention that the releases were "procured . . . [by] fraud and undue influence" and that, as a result, were "void."  In support of their arguments, plaintiffs each submitted a declaration describing their experiences with defendants from first contact through the filming and airing of *Afflicted*, including their respective descriptions of the circumstances under which the releases were executed.

On March 2, 2020, the trial court held a hearing on the motion to strike and on March 27, 2020, the court issued a written ruling denying the motion.  On the question of whether the acts at issue in plaintiffs' claims were in connection with an issue of public interest, the court ruled that they were.  On the issue of whether plaintiffs could demonstrate a probability of prevailing on the merits of their claims, the court considered, among other things, whether the releases barred plaintiffs' claims.  The court concluded that it was "reasonable that a jury could find that the [r]eleases were obtained through a fraudulent misrepresentation about the purpose of [*Afflicted*]."  [Citations.] Because it is for the jury to decide if the [r]eleases were validly obtained, the existence of the [r]eleases is not a categorical bar to [p]laintiff[s'] claims."  The court also concluded that plaintiffs had presented a sufficient prima facie showing on each of their claims and therefore denied the motion.

7

Defendants filed a timely notice of appeal from the order denying their motion.

## IV.    DISCUSSION

### A.    *Anti-SLAPP Procedure*

"A SLAPP suit—a strategic lawsuit against public participation—seeks to chill or punish a party's exercise of constitutional rights to free speech and to petition the government for redress of grievances.  [Citation.]  The Legislature enacted . . . section 425.16—known as the anti-SLAPP statute—to provide a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055–1056; § 425.16, subd. (b)(1).)  "Resolution of an anti-SLAPP motion involves two steps.  First, the defendant must establish that the challenged claim arises from activity protected by section 425.16.  [Citation.]  If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).)

At the first step, "[t]he moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).)" (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)

"To satisfy the second prong, 'a plaintiff responding to an anti-SLAPP motion must '"state[] and substantiate[] a legally sufficient claim.'" [Citation.] Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 . . . .) 'We consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.'" (*Soukup v. Law Offices of Herbert Hafif* [(2006)] 39 Cal.4th [260,] 269, fn. 3 [(*Soukup*)].)" (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.) "We have described this second step as a 'summary-judgment-like procedure.' [Citation.] . . . '[C]laims with the requisite minimal merit may proceed.' (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 94 . . . ).)" (*Baral, supra*, 1 Cal.5th at pp. 384–385, fn. omitted.)

We review an order granting or denying a motion to strike under section 425.16 de novo. (*Soukup, supra*, 39 Cal.4th at p. 269, fn. 3.)

B.    *First Prong:  An Issue of Public Interest*

The trial court concluded that defendants satisfied their burden under the first prong of the anti-SLAPP statute by showing that plaintiffs' claims arose from defendants' exercise of

9

the right of free speech in connection with an issue of public interest. In their respondents' brief, plaintiffs do not dispute that their claims arise from defendants' conduct in furtherance of their rights of free speech. But they argue that the court "erred in giving [defendants] the benefit of the doubt that [*Afflicted*] is indeed about what they claim, even when the evidence indicates otherwise." They therefore urge us to conclude "that [defendants'] activities do not concern [an issue] of public interest as was meant to be protected by [section 425.16]."

Plaintiffs' own allegations, however, concede that the subject matter to be addressed in *Afflicted* had the potential to raise public awareness of and funding for the treatment of chronic illnesses. For example, plaintiffs alleged that Jamison, Olave, Bekah, and Edelstein believed their participation in *Afflicted* and its airing on a platform like Netflix,[5] could "foster a greater understanding of chronic illnesses [in] the general public, thereby sowing more compassion for its sufferers, and it was hoped, greater funding for research into the causes and potential cures for the illnesses . . . ."

Although plaintiffs disagree that the final version of the series effectively realized the potential to raise awareness and educate the public about chronic illnesses, they do not dispute that the topic addressed by the series—chronic illness—was a matter of public interest worthy of serious consideration. Plaintiffs' claims thus arose from acts in furtherance of the right of free speech in connection with an issue of public interest, regardless of whether the issue was allegedly misrepresented to the public. (*Rivera v. First DataBank, Inc*. (2010) 187

---

[5] Plaintiffs alleged that Netflix had over 100 million subscribers.

Cal.App.4th 709, 716.) The trial court therefore did not err in concluding that defendants had satisfied their burden on the first prong.

## C. *Second Prong: Probability of Success*

### 1. Consent/Release Defenses

Once defendants satisfied their burden on the first prong, the burden shifted to plaintiffs to make a prima facie showing that each of their claims had minimal merit. That burden included the requisite showing on the consent/release defenses, i.e., their claims were not barred under the common law doctrine of consent[6] or by the broad language of the liability releases contained in each of the agreements they signed.[7] (See *Weeden v.*

---

[6] "One of the oldest and most widely recognized defenses to the publication of defamatory matter is the doctrine of consent, which has been classified as a form of *absolute privilege*." (*Royer v. Steinberg* (1979) 90 Cal.App.3d 490, 498.) "'The privilege conferred by the consent of the person about whom the defamatory matter is published is absolute. The protection given by it is complete, and is not affected by the ill will or personal hostility of the publisher or by any improper purpose for which he may make the publication . . . .' [Citation.] By its very definition, an absolute privilege cannot be overcome by a showing of actual malice; malice is simply not the proper subject of inquiry in such a case. [Citations.]" (*Id.* at p. 499.)

[7] "A release is an instrument by which the signing party (releasor) relinquishes claims or potential claims against one or more persons (releasees) who might otherwise be subject to liability to him. The existence of a valid release is *a complete*

11

*Hoffman* (2021) 70 Cal.App.5th 269, 288 ["At this [second-prong] stage, a plaintiff must show that any asserted defenses are inapplicable as a matter of law or make a prima facie showing of facts that, if accepted, would negate such defenses. [Citation.]"].)

To satisfy their second-prong burden on the consent/release defenses, plaintiffs maintained that the releases were void[8] because their evidence showed they were procured by "fraud and undue influence." The trial court agreed, concluding that plaintiffs' evidence was sufficient to allow a jury to conclude that the releases were "obtained" through "a fraudulent misrepresentation" about the purpose of *Afflicted*. On appeal, plaintiffs reiterate that their evidence shows the releases were "void" and had "no force or effect," citing *Vai v. Bank of America National Trust & Savings Assn.* (1961) 56 Cal.2d 329, 344 and *Jimenez v. 24 Hour Fitness USA* (2015) 237 Cal.App.4th 546, 563.)

### a. Background

On August 20, 2017, Edelstein was provided a copy of a release which she signed "without further consideration." But she only agreed to participate in the series and "risk the invasion

---

*defense to a tort action* against the releasee." (*Rodriguez v. Oto* (2013) 212 Cal.App.4th 1020, 1026, italics added.)

[8] It was unclear whether plaintiffs were asserting that the releases were void due to fraud in the execution or voidable due to fraud in the inducement. (See *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 415.)

to her privacy" so she could bring awareness to mold illness and educate the public.

On August 31, 2017, shortly after the start of filming, Feczko was provided a release to sign. She understood from experience "that there were privacy rights and a release that needed to be provided . . . for the production company to permit filming." She signed the release based on "the understanding and [the] description of the show *Afflicted*, as 'a documentary about chronic illness.'" She "relied upon these statements to sign the . . . release form provided to [her], but also to even consider and further participate in casting and production."

According to Olave, "[a]t the time of filming, on or about June 8, 2017, [she] was handed the . . . release . . . . [¶] Instantly, [she] was pushed to sign the . . . release because, without it, [she] would be cut from [the] production. [¶] In fact, [she] was advised by LoGreco that . . . Lincoln 'was an attorney [who] . . . had reviewed the . . . release, and said it was fine for [her] to sign.'"

In the beginning of the filming process, in June 2017, LoGreco and Lincoln visited the site and delivered to Bekah, Bercowetz, and Nick "a litany of papers, which included the . . . release and HIPAA forms . . . . [¶] At the time, [Bekah] was far too sick to understand, or even read the papers LoGreco requested that [they] sign, which [she] advised LoGreco in person. (Emphasis omitted.) [¶] From the moment [Berkowetz], Nick, and [Bekah] were provided [the] papers, [they] were pressured to sign them immediately and without anyone else reviewing them. [¶] [P]roducer Julio Pabon [(Pabon)] . . . , one of the first producers to work with [them] on [the] filming, had stated many times that 'we [i.e., Doc Shop] have a limited budget,

13

we rented all this equipment, and we can't do anything until you sign these documents,' which included the . . . release. [¶] LoGreco further pushed, stating to [Bercowetz], Nick, and [Bekah] that 'this is extremely basic stuff. We don't care about it but the back office needs it. We really need this to film. Otherwise, you won't be in the production.' [¶] In other conversations [on] or around June 27, 2017, with . . . Lincoln, [she] joined in LoGreco's push to get the papers signed, stating that, 'these are just forms that we need to put you on camera, and nothing more.'"

Bekah, Bercowetz, and Nick held the documents for a day while attempting to find a lawyer to review them. When they could not locate a lawyer, Bekah had a friend review them, but the friend "provided no useful feedback." While Bekah, Bercowetz, and Nick had the papers in their possession, Pabon told them that Lincoln was a lawyer and that she had "reviewed the . . . release and confirm[ed] that [it was] ok for [Bekah] to sign."

On June 27, 2017, Bekah also spoke to LoGreco who assured her that *Afflicted* "was going to be 'a serious documentary about chronic illness' for which [her] story would be used as an illustrative example . . . ." (Emphasis omitted.) Based on the "pressure by Doc Shop producers, LoGreco and Lincoln," as well as LoGreco's assurances that the series would be a serious documentary and Lincoln's confirmation that it was "'OK'" for her to sign the release, Bekah "reluctantly signed the documents without having counsel review them [based on] the insinuated threat that [if they did not sign the] papers without further delay, [she, Bercowetz, and Nick] would be cut from the show (which meant [her] conditions and illnesses would not get the necessary

14

exposure to beget public awareness and potentially additional research funding).”

Several days prior to flying to California to join Bekah and Bercowetz, Nick received a nondisclosure agreement by e-mail. But, unlike that agreement, Lincoln did not provide Nick with the release in advance; instead she waited until the first day of filming to provide releases to him, Bekah, and Bercowetz collectively, “and [then] pushed [them] to sign immediately.” Nick knew Lincoln was an attorney, so he relied on her when she told him that the forms containing the releases “simply ‘[gave] Netflix permission to use [their] images on TV,’ advis[ed] [him] ‘there was no risk involved in signing it’ and profess[ed] it to be ‘standard paperwork.’” LoGreco also “pushed similarly, explaining that [they could] trust [defendants] because Partland’s wife was chronically ill, which was told to [him] to encourage [his] signing of the release form without reading it. LoGreco further explained that *Afflicted* was going to be a serious ‘medical documentary’ . . . .” When Nick, Bekah, and Bercowetz hesitated to sign the releases, LoGreco became irritated and advised “‘it’s not a contract, it’s an agreement.’”

At the start of filming, LoGreco visited the site and handed Bercowetz “a litany of papers,” including the release. LoGreco “pushed, stating that ‘this is extremely basic stuff. We don’t care about it but the back office needs it. We really need this to film. Otherwise, you won’t be in the production.’”

Bercowetz had the documents for a day and attempted unsuccessfully during that time to locate a lawyer. Bekah had a nonlawyer friend review the release and explain the substance of it, but the information the friend provided was “generally

15

inapplicable." Bercowetz stated that he did not have access to and could not afford a lawyer.

The day after Bercowetz received the release, Pabon told him that Lincoln was a lawyer, that she had reviewed the release, and that she "agree[d] it [was] ok for [him] to sign." Bercowetz "reluctantly signed the document[]."

On July 11, 2017, Pabon e-mailed Hill and mentioned that a release would be provided which needed to be signed. But Hill did not receive the release until after the first day of the filming. According to Hill, at a "mid-break from filming, [he] needed to rest in a dark room in order to recuperate. It was [at] that time, [when he] was exhausted and . . . in [a] near-blacked-out room [that] Lincoln brought in the paperwork for [him] to sign. [H]e was in absolutely no condition to read, review, or even understand the . . . release at that moment . . . . Lincoln knew that . . . [because she] handed [him] the . . . release . . . in a room in which [he] could not even physically read the document[]." Lincoln told Hill at the time that she was a lawyer and that the papers were "simple formalities needing no actual inspection or scrutiny. [He] took Lincoln at her word and signed the papers . . . without being physically able to read them." In addition, Lincoln told Hill that if he did not sign, he would be "'scrapped' from the show and all of the investment [he] and they had put in thus far would be for nothing." And, Lincoln had previously promised Hill medical treatment by "'a real ME doctor'" in return for his participation, and he was therefore also concerned that, if he did not sign the release, Lincoln would discontinue her search for such care.

b.     Section 1668

Although plaintiffs argued in the trial court that the releases were void due to fraud, they did not argue—below or in their respondent's brief—that the releases of their tort claims were void as against public policy under Civil Code, section 1668 (section 1668).[9]  We therefore asked the parties to file supplemental briefs on that issue.[10]

In their brief, defendants concede that section 1668 prohibits the release of fraud claims, but maintain that the offending portion of the release concerning fraud can be severed and the balance of the release enforced against the defamation and false light claims.  Citing *Royer, supra*, 90 Cal.App.3d 490, Restatement (Second) of Torts, section 583, and *Kelly v. William Morrow & Co.* (1986) 186 Cal.App.3d 1625 (*Kelly*), defendants argue that the releases here unambiguously set forth plaintiffs'

[9]     Section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

[10]     We also asked the parties to brief whether the section 1668 issue was forfeited, by plaintiffs' failure to raise it below, or waived, by their failure to raise it in their respondent's brief.  In their supplemental briefs, the parties disagree on whether plaintiffs forfeited or waived the issue.  Because the application of section 1668 to plaintiffs' tort claims involves a question of law on an important matter of public policy that has now been fully briefed on the merits, we exercise our discretion to excuse any forfeiture or waiver and review the issue.  (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293–1294.)

prelitigation consent to the conduct underlying the defamation and false light claims and therefore constitute complete defenses to each of those claims.

In their supplemental brief, plaintiffs do not directly address section 1668, as applied to the defamation or false light claims, nor do they discuss the common law doctrine of consent as it relates to those claims. Instead, they assert that, because the releases encompass intentional tort claims, such as fraud, that are prohibited by the statute, the releases are void *in their entirety* as against public policy.

We agree with the parties that, under section 1668, the release defense does not apply to plaintiffs' fraud claims as a matter of law. As to the other claims, we will assume, without deciding, that section 1668 does not apply to defendants' contention that the releases constituted a consent to plaintiffs' defamation and false light claims. (See *Kelly, supra*, 186 Cal.App.3d at p. 1634 [""""The privilege conferred by the consent of the person about whom the defamatory matter is published is absolute. The protection given by it is complete, and is not affected by the ill will or personal hostility of the publisher or by any improper purpose for which he may make the publication . . .""""]; but see *McQuirk v. Donnelley* (9th Cir. 1999) 189 F.3d 793, 796–797 [holding that section 1668 prohibits the release of defamation claims as intentional torts].)

c.      Consent/Release Defense

We therefore next consider whether plaintiffs met their burden to demonstrate that there was minimal merit to their

18

contention that the releases did not bar their defamation and false light claims.

According to *Kelly, supra*, 186 Cal.App.3d 1625, consent, in the context of defamation, is a form of waiver which "'requires a voluntary act, knowingly done, with sufficient awareness of the relevant circumstances and likely consequences. [Citation.] There must be actual or constructive knowledge of the existence of the right to which the person is entitled. [Citation.] The burden is on the party claiming a waiver to prove it by evidence that does not leave the matter doubtful or uncertain and the burden must be satisfied by clear and convincing evidence that does not leave the matter to speculation. . . .' [T]he extent of the privileges conferred by the waiver must be determined in the light of the circumstances in which it was executed. . . . Whether [the plaintiff] sold his birthright to privacy for a mess of pottage when he signed the waiver can only be determined by a trier of fact." (*Id.* at p. 1635.)

Plaintiffs maintain that they did not knowingly and voluntarily waive their rights not to be defamed or portrayed in a false light. Edlestein and Feczko explained that they signed the releases under the false assumption that the series would be a serious documentary about chronic illness that would raise awareness of conditions like Edelstein's and serve to educate the public. The other plaintiffs claimed that they had been pressured into signing the releases, told they would be cut from the series if they did not sign, and assured by Lincoln and others that the releases were mere formalities or routine paperwork that needed to be signed. Bekah and Hill also asserted that they were too ill or tired when they were presented with the releases to understand the significance of the documents they were signing.

19

In light of the circumstances under which each plaintiff signed the release and defendants' heightened burden to demonstrate waiver by clear and convincing evidence, we conclude that plaintiffs met their second-prong burden to demonstrate that there was minimal merit to their contention that they did not knowingly and voluntarily waive their defamation and false light claims. (*De Havilland v. FX Networks, LLC* (2018) 21 Cal.App.5th 845, 856 ["To satisfy this prong-two showing, the plaintiff must present credible evidence that satisfies the standard of proof required by the substantive law of the cause of action the anti-SLAPP motion challenges. Generally, a plaintiff's claims need only have "'minimal merit'" to survive an anti-SLAPP motion"] (*De Havilland*).) Having concluded that the releases did not bar plaintiffs' claims, at least on the limited factual record currently presented, and accounting for the governing minimal merit standard under the anti-SLAPP procedure, we next turn to whether plaintiffs submitted sufficient evidence to demonstrate that each claim had minimal merit.

2.    <u>Defamation/False Light Claims</u>[11]

"The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.' [Citations.]" (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.) "Libel, a form of defamation [citation], 'is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.' (Civ. Code, § 45.) To determine whether a representation is libelous, 'we look to what is explicitly stated as well as what insinuation and implication can be reasonably drawn from the communication. [Citation.] . . . In this connection the expression used as well as the "whole scope and apparent object of the writer" must be considered. [Citation.]' [Citations.] [¶] . . . 'Whether published material is reasonably susceptible of an interpretation which implies a provably false assertion of fact—the dispositive question in a defamation action—is a question of law for the court. [Citations.] This question must be resolved by considering whether the reasonable or "average" reader would so interpret the material. [Citations.] The "average reader" is a reasonable member of the audience to

---

[11]    Because plaintiffs' defamation and false light claims are based on the same set of operative facts, we consider them together because "[w]hen . . . an invasion of privacy claim rests on the same allegations as a claim for defamation, the former cannot be maintained as a separate claim if the latter fails as a matter of law. [Citation.]" (*Alszeh v. Home Box Office* (1998) 67 Cal.App.4th 1456, 1464 (*Alszeh*).)

21

which the material was originally addressed. [Citations.]' [Citation.]" (*Alszeh, supra*, 67 Cal.App.4th at p. 1460–1461.)

"""False light is a species of invasion of privacy, based on publicity that places a plaintiff before the public in a false light that would be highly offensive to a reasonable person, and where the defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed.'" [Citation.] (*De Havilland, supra*, 21 Cal.App.5th at p. 866.) To defeat defendants' anti-SLAPP motion on their false light claims, plaintiffs must demonstrate a reasonable probability that they can prove defendants' statements in the broadcast version of *Afflicted* were (1) assertions of fact, (2) actually false or create a false impression about them, and (3) highly offensive to a reasonable person or defamatory. (*De Havilland, supra*, 21 Cal.App.5th at pp. 865–866.) To the extent plaintiffs are limited public figures, they must also show that defendants acted with actual malice, i.e., they either knew the statements were false or acted in reckless disregard of the falsity. (*Ibid.*)

a. Implied Defamatory Facts

Each of the four plaintiffs who claimed to be suffering from a chronic illness testified that they had been diagnosed as suffering from, and were being treated for, recognized medical conditions and that, as confirmation of that fact, they provided defendants with access to their medical records and treating physicians. Moreover, defendants do not dispute that each of those plaintiffs had been diagnosed as suffering from a recognized medical condition.

22

Nevertheless, the version of *Afflicted* that defendants decided to air—i.e., publish—included numerous statements from health care professionals and others that were reasonably susceptible to an interpretation that defendants were portraying plaintiffs' illnesses, and accompanying physical symptoms, as not the result of any underlying, diagnosable medical condition, but rather as either the product of plaintiffs' imaginations or some mental disorder. Specifically, the excerpts from show scripts submitted in opposition to the motion to strike confirm that defendants published the following:

At the outset of *Afflicted*, Bekah states: "It's like you have a gun in your mouth, and you're screaming, and somebody's saying, 'No, you don't have a gun in your mouth. Stop screaming.'" An unidentified man then says, "Is it psychosomatic, is it psychological?" A doctor then states, "There is no single biomarker, no single test," and another doctor says, "It's got to be in your head, because I can't figure it out." A participant in the series explains, "Many don't believe. Nobody listens."

In the third episode of *Afflicted*, a mood disorder specialist, remarks, "I have had a few patients who became so identified with their illness that they really weren't willing to be cured." Later, a psychiatrist opines about Olave's illness, chemical sensitivity, concluding, "[Y]ou have to entertain the hypothesis that this is not a physical problem, but this is an emotional one." The psychiatrist also discusses Hill's condition, explaining, "When you see that there's a link between a particular event that's upsetting and the onset of a problem, you do wonder whether it's a direct translation of an emotional conflict into a physical alteration in the body." As to Bekah's Lyme disease, the

23

doctor suggests, "Statistically, it's more likely that the cause of the problem is a common psychiatric problem more than it is an unknown or uncatalogued physical illness. You can be deluded that you're sick, meaning you can believe you're sick when in fact you're not sick. You can have a false belief about anything." And, he generally concludes, "I mean, literally, it's originating in their head, but there are messages being sent between your brain and your gut. If you perceive pain but you have no obvious physical source for pain, you still experience pain."

Finally, *Afflicted* features other doctors who provide similar views of the participants' illnesses. A doctor states, "Patients who have emotional issues, that can translate physically, and we find that to be true especially for chronic illnesses." As to Lyme disease, yet another doctor explains, "Lyme imitates many psychiatric symptoms," followed by yet another doctor who agrees, "They may have a psychosomatic origin," and another who adds, "[t]he diagnosis is elusive."

The undisputed facts concerning plaintiffs' diagnosed medical conditions, when contrasted with the show script excerpts and aired version of *Afflicted*, were sufficient to constitute a threshold showing that defendants could be reasonably understood as falsely implying that (1) the four sick plaintiffs were imagining their illnesses due to some psychological or mental condition and (2) their caregivers were gullible pawns or enablers who had been duped into providing care for persons who did not need it. "[I]f a defamation claim is based on allegations of *implied* defamatory facts, the court must make a threshold preliminary determination whether the published statements could be understood as implying the alleged defamatory content. If the statements are susceptible of

both an innocent and libelous meaning, it is for the jury to decide how they were in fact understood. (*Forsher v. Bugliosi* (1980) 26 Cal.3d 792, 803 . . . .) This threshold determination is based on the common law principle that if a statement, innocent on its face, cannot be understood as implying defamatory facts, then it may not be the basis of a defamation cause of action. (*Ibid.*)" (*Weller v. ABC* (1991) 232 Cal.App.3d 991, 1001, fn. 8.)

### b. Unprivileged

Other than the consent issue discussed above, defendants do not contend that the challenged statements from *Afflicted* are subject to any other recognized privilege.

### c. Actual Malice

For purposes of our analysis of plaintiffs' second-prong showing on the defamation and false light claims, we will assume without deciding that they are limited public figures and were therefore required to submit prima facie evidence of actual malice. "If the person defamed is a public figure [or limited public figure], he must show, by clear and convincing evidence, that the defamatory statement was made with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false." (*Mitchell v. Twin Galaxies, LLC* (2021) 70 Cal.App.5th 207, 218.) "In evaluating whether a plaintiff has made a prima facie showing of actual malice, 'we bear in mind the higher clear and convincing standard of proof.'" (*Ibid.*)

Plaintiffs submitted evidence that defendants knew their statements in *Afflicted* concerning the psychological or mental origins of plaintiffs' illnesses were false or misleading, including testimony showing that defendants were given access to plaintiffs' medical records and treating physicians who had diagnosed the sick plaintiffs with known illnesses. Such evidence supported a reasonable inference that defendants therefore knew or acted with reckless disregard as to the falsity of the suggestions in *Afflicted* that plaintiffs' illnesses were not real, but imaginary, and that their caregivers were duped.

### d. Special Damages

Defendants argue that because the challenged statements from *Afflicted* were not defamatory per se, plaintiffs were required to show proof of special damages resulting from the airing of *Afflicted*. In support of this contention, they cite *Gomes v. Fried* (1982) 136 Cal.App.3d 924, which distinguished between libel per se and "'[d]efamatory language not libelous on its face[, which] is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof.'" (*Id.* at p. 939.)

As to damages, Edelstein testified that, as a result of the airing of *Afflicted*: (1) she had been required "to fend off online attacks on [her] character, on [her] business, and to [her] livelihood;" (2) she had been "'ghosted'" by her doctors and medical staff who refused to take calls or return messages about medical appointments; (3) her psychotherapy practice had suffered, as prospective clients would not seek treatment from a "crazy[] hypochondriac;" and (4) she had been "constantly

26

attacked and bullied" online by persons who believed she had "hurt [Feczko]," to the point where she was compelled to retain the services of an attorney to obtain a protective order.

Following the airing of *Afflicted*, Feczko, an experienced film editor, was "personally and professionally damag[ed]" by: (1) the "stress and strain of dealing with the public[] and [the] media" to correct the image of her portrayed in *Afflicted*; and (2) the loss of business, including the type of "higher-paying jobs" that she had been obtaining prior to the broadcast of the show.

As soon as *Afflicted* aired, Olave began receiving "harassing messages" and "online bullying," including demands that she commit suicide and threats to her life. When the series subsequently aired in South America, she received "messages from people back home, threatening to kill [her] and other disparaging commentary."

Hill claimed that following the airing of *Afflicted*, he (1) had spent countless hours defending himself against skeptics; (2) could no longer get media publications to publish his work which, as a writer, he had successfully made a living doing prior to *Afflicted;* and (3) had experienced extreme stress and anxiety which had compromised his health.

Bekah claimed *Afflicted* "impacted every aspect of [her] life," including damage to: (1) her "credibility in the art community" which had been "irretrievably tarnished;" (2) her health and her "ability to engage with the world," each of which had been adversely affected due to harassment and bullying "in public and on the internet;" and (3) her ability to obtain employment, attract customers, and maintain adequate social and support networks.

Nick claimed that, due to *Afflicted*, he: (1) lost income as a result of time spent filming the series while also caring for Bekah; (2) was disparaged as either a "facilitator of a crazy person" or an inept caretaker; (3) experienced difficulty caring for Bekah and suffered stress in "[t]he aftermath of the release" of the series; (4) saw a diminution of his "online presence," which was essential to his ability to obtain work as a freelance musician and music teacher; and (5) suffered damage to his professional reputation and personal life.

Bercowetz claimed that *Afflicted* caused him: (1) to seek therapy for the trauma caused by being "cast as a crazy cast member;" (2) to abandon his career path as a chaplin and delay his training at the Harvard Divinity School, where he had been attending on a scholarship; (3) to abandon the thesis "central to his studies" based on "the journey with Bekah;" and (4) to suffer "untold harm and devastation" in the "art community," which was the "way [he] earned [his] living."

Defendants contend that plaintiffs' "vague, argumentative, and conclusory declarations" did not adequately show the specific economic harm caused by their portrayal in *Afflicted*. "But the plaintiff's second-step burden is a limited one. The plaintiff need not prove her case to the court [citation]; the bar sits lower, at a demonstration of 'minimal merit' [citation]. At this stage, "'[t]he court does not weigh evidence or resolve conflicting factual claims.'"" (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 891.) Under this standard, plaintiffs' evidence showing how their lives and careers were adversely affected by the airing of *Afflicted*, when viewed in a light most favorable to them, demonstrates that their defamation damage claims have minimal merit.

28

3.      Fraud Claims

As to the remaining cause of action asserting that plaintiffs were fraudulently induced into allowing defendants to film and portray them in *Afflicted*, we conclude that each presented sufficient evidence of a prima facie case to satisfy their second-prong burden on the elements of their claims.

"'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 676, p. 778; see also Civ. Code, § 1709; *Hunter* [*v. Up-Right, Inc.* (1993)] 6 Cal.4th 1174, 1184; *Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1108 . . . [(*Molko*)].)" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)

"All of these elements must be present if actionable fraud is found; one element absent is fatal to recovery.  There is no absolute or fixed rule for determining what facts will constitute fraud; whether or not it is found depends upon the particular facts of the case under inquiry.  Fraud may be proved by direct evidence or it may be inferred from all of the circumstances in the case. (*Jorgensen v. Jorgensen*[ (1948)] 32 Cal.2d 13, 18, 21 . . . .) 'Actual fraud is always a question of fact.'  (Civ. Code, § 1574.)" (*Pearson v. Norton* (1964) 230 Cal.App.2d 1, 7–8.)

### a. Misrepresentation

#### (i) *Statements About* Afflicted

Plaintiffs' evidence shows that defendants, through their agents, made similar statements of fact to each plaintiff about the nature and purpose of the proposed *Afflicted* series.

In June 2017, Edelstein received an e-mail from *Afflicted* casting producer Ashley York, which described the series as a "documentary" that would "explor[e] chronic illness and undiagnosed diseases and illnesses," (emphasis omitted) a description that was repeatedly used by Doc Shop producers.

Feczko had been "a non-fiction documentary television and film editor" for 27 years. She and Edelstein were advised that defendants intended to create "a serious medical documentary about chronic illness."

According to Olave, "[f]rom the very first contact, . . . Lincoln and . . . LoGreco advised [her] that *Afflicted* would be a documentary about chronic illness, specifically 'a documentary designed to educate the public and bring awareness' to conditions from which [she] ha[d] suffered. [¶] [She] was advised that . . . Partland . . . [had] a wife who had a severe and debilitating chronic illness."

Bekah was told that *Afflicted* would be a serious documentary about chronic illness and that it would not be a show "pitting patient against doctor." She was also told that the show would not suggest that her illness was "psychosomatic." She was instead informed that the show would educate the public about her condition and that her medical records and doctors would be used "to showcase the medicine."

According to Nick, he, Bekah, and Bercowetz "experienced" together all conversations with producers about the series. He therefore incorporated into his declaration Bekah's testimony concerning statements made to her about *Afflicted*.

Bercowetz was told that *Afflicted* would be a documentary about chronic illness, using Bekah and others as illustrative examples of the illnesses to be covered. Bercowetz was advised that "[d]efendants' goal was to give Bekah and [him], and others similarly situated, 'a voice' to elaborate upon the illnesses from which Bekah suffered and [to] educate the public on [her] illnesses with respect to diagnosis [and] efficacy of treatment . . . ."

In the Spring of 2017, Hill was contacted by Parker Deleon (Deleon), a casting producer for Doc Shop, who advised that Netflix was "making a series about chronic illness, and that [Hill] would be showcased as an illustrative example of how severe [m]yalgic [e]ncephalomyelitis (ME) may present." Deleon stated that if Hill "made it on the series [he], along with several other people, would be filmed living with a chronic illness through 'a compassionate lens.'" He also told Hill that the series would give "[those featured] a voice through which [they] may raise awareness and educate the public on the character, scope, and extent of [their] illnesses." Hill believed public awareness and education would "beget[] research and funding for discovery of treatments, which would obviously change [his] life." When Hill learned that Deleon had been on "a popular reality TV show," he asked if "*Afflicted* was going to be reality [television], [but Deleon] responded, 'No. *Afflicted* is a documentary about chronic illness, not a reality [television] show.'"

31

(ii)    *Falsity*

To show the falsity of defendants' statements about the nature and purpose of *Afflicted*, plaintiffs submitted excerpts from the show scripts (described in detail above) suggesting that the participants' illnesses, which were documented in their medical records, were instead psychological or imaginary.

Plaintiffs' testimony about the representations made to them during their recruitment, when read together with the show script excerpts, support a reasonable inference that defendants' descriptions of the proposed series differed significantly from the final version that aired.  It therefore constitutes a prima facie showing that defendants statements about the nature and purpose of *Afflicted* were false and misleading.

b.    Knowledge of Falsity

"Regarding the element of scienter, evidence of the falsity of a representation is sufficient to raise a triable issue of fact as to the element[] of knowledge of the falsity.  In *Maxson v. Llewelyn* (1898) 122 Cal. 195 . . . , the defendant argued there was insufficient evidence to show that at the time he made the representations he did not believe they were true.  Our Supreme Court . . . stated:  'It would in most cases be extremely difficult, and in many cases absolutely impossible, to procure direct evidence of this nature.  In all cases it is permissible to prove fraud by circumstances, and in most cases it is the only evidence available.  In aid of the direct facts proved, legitimate inferences are permitted to be indulged to establish other facts not directly

32

in evidence.' (*Id.*, at p. 198.)" (*Hart v. Browne* (1980) 103 Cal.App.3d 947, 957–958 (*Hart*).)

Plaintiffs submitted excerpts from Partland's declaration in which he admitted that he intended *Afflicted* to be an "observational documentary" focusing on the emotional experiences of the patients, rather than the "granular details of the science of their illnesses." He also admitted knowing that some medical professionals believed that rare chronic illnesses had "psychological roots." And, he admitted that he and "his team" wanted to "explore stories that might have tension," either between the patient and his or her support network or the patient and his or her doctors. In addition, Nick explained that, after *Afflicted* aired, he exchanged e-mail messages with Lincoln in which she confirmed her initial understanding that the series was to be a serious and empathetic portrayal of the participants' illnesses and agreed that the final product was "much different" than what she, Lo Greco, and York had anticipated, claiming that Partland and Netflix controlled the editorial process and had a "different idea" about how the participants' stories would be told. This evidence supported a reasonable inference that Doc Shop and Netflix, through their agents Partland and others, were aware at the time they recruited plaintiffs that the final version of *Afflicted* would not air as represented to plaintiffs, i.e., a serious documentary about chronic illness, grounded in science and told through a compassionate lens, that would give voice to the participants and raise awareness of and educate the public about chronic illness. Plaintiffs therefore satisfied their prima facie evidentiary burden on the scienter element.

### c.     Intent to Induce Reliance

"The . . . third element[] [of fraud], consisting of . . . *intent to induce reliance*, relate[s] to [the defendant's] state of mind. Th[is] element[] may be proved by inference." (*Hart, supra*, 103 Cal.App.3d at p. 957, italics added.) "[B]ecause the real intent of the parties and the facts of the transactions are peculiarly within the knowledge of those sought to be charged with the fraud, proof indicative of fraud must come by inference from the circumstances surrounding the transaction, the relationship and interests of the parties. (*Moore v. McDonald*[ (1932)] 122 Cal.App. 61, 69 . . . , and cases cited.)" (*Fross v. Wotton* (1935) 3 Cal.2d 384, 393; see also *Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 30 ["fraudulent intent must often be established by circumstantial evidence"].)

Plaintiffs submitted evidence that defendants' agents made false statements while recruiting plaintiffs to participate in *Afflicted* and that, as a result, plaintiffs agreed to participate in *Afflicted* and provided defendants with access to their medical records and doctors. This was sufficient evidence from which to infer that defendants acted with an intent to induce reliance by plaintiffs.

### d.     Justifiable Reliance

"Justifiable reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which alters his legal relations, and when without such misrepresentation or nondisclosure he would not, in all reasonable probability, have entered into the contract or other

transaction." (*Molko, supra*, 46 Cal.3d at p. 1108.) "'Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.'" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239.)

Plaintiffs submitted individual testimony showing they actually relied on defendants' statements about *Afflicted* in determining whether to participate. Edelstein, a medical professional, testified that, believing *Afflicted* to be a serious medical documentary, she agreed to participate and gave defendants access to her doctors, medical records, treatment, and medical practice from which she made her living. She also gave defendants permission to use her "full accreditation as a psychotherapist and a visual depiction of the sign on [her] office door."

Feczko agreed to participate because she had been convinced *Afflicted* would be a serious medical documentary "designed to be [an] objective . . . portrayal of facts . . . ."

Olave based her decision to participate on the fact that (1) Partland's wife suffered from chronic illness, causing her to trust that the series would treat the topic seriously; and (2) defendants' statement that her participation would "'bring hope to many people.'"

Bekah, Nick, and Bercowetz participated because they believed the series would bring public awareness to the topic of chronic illness, would help educate the public about it, and would generate revenue for medical research into Bekah's illness.

Hill participated because he believed he would be shown as an example of someone living with his illness and because he was convinced that a serious documentary about his illness would not

35

only educate the public, but also generate revenue for research into new treatments of his disease.

Plaintiffs' evidence concerning the reasons they agreed to participate in *Afflicted* supports an inference that they relied on defendants' misrepresentations about the purpose of the show in deciding to participate in it. And there is nothing about their agreement to participate in a purported documentary series that was so unreasonable as to render their reliance unjustifiable.

e.      Resulting Damage

As detailed above in the discussion of the evidence supporting the defamation and false light claims, each plaintiff submitted testimony describing the adverse impacts that the airing of *Afflicted* had on his or her life and/or career from which reasonable inferences of economic injury could be drawn. Therefore, under the low-bar "minimal merit" standard governing our second-prong analysis, plaintiffs satisfied their burden on fraud damages.

## IV.  DISPOSITION

The order denying the special motion to strike is affirmed. Plaintiffs are awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KIM, J.


We concur:


BAKER, Acting P. J.


MOOR, J.